**AIR LINE PILOTS' ASSOCIATION INTERNATIONAL, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, FEDERAL AVIATION ADMINISTRATION, John H. Shaffer, Administrator, Respondent.**

No. 29564.

United States Court of Appeals, Fifth Circuit.

July 12, 1971.

John E. Collins, Mullinax, Wells, Mauzy & Collins, by L. N. D. Wells, Jr., Dallas, Tex., for petitioner.

Gen. Counsel, FAA, Washington, D. C., Alan S. Rosenthal, Leonard Schaitman, Attys., Dept. of Justice, L. Patrick Gray, III, Asst. Atty. Gen., Washington, D. C., for respondent.

Before O'SULLIVAN,* THORNBER-RY and DYER, Circuit Judges.

THORNBERRY, Circuit Judge.

In this case the petitioner, Air Line Pilots' Association International [hereinafter referred to as ALPA], seeks direct review by this Court [1] of a determination by the Federal Aviation Administration that the proposed construction of three high-rise complexes in downtown Dallas, Texas, taken together with proposed FAA adjustments in procedures governing flight operations into and out of Dallas' Love Field, would not constitute "a hazard to air navigation."

## I. REGULATORY FRAMEWORK

We are dealing here with a rather complicated federal regulatory scheme, and it should be the starting point in our examination of the questions presented for review.

The Federal Aviation Act of 1958, 49 U.S.C.A. §§ 1301 et seq. invests the FAA Administrator with broad powers to foster air safety, including the power to regulate "the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace." 49 U.S.C.A. § 1348(a). The Act also empowers the Administrator to prescribe "air traffic rules and regulations governing the flight of aircraft * * * including * * * rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects." 49 U.S.C.A. § 1348(b). In addition to the foregoing, the Act also deals with hazards to air safety presented by the existence of tall structures such as power lines, oil drilling derricks, radio and TV antenna towers and buildings. Specifically, the Act provides that

[t]he Administrator shall, by rules and regulations, or by order where necessary, require all persons to give adequate public notice, in the form and manner prescribed by the Administrator, of the construction or alteration, or of the proposed construction or alteration, of any structure where notice will promote safety in air commerce.

49 U.S.C.A. § 1501. Finally, the Act gives the Administrator power to issue such regulations and orders, and conduct such investigations, "as he shall deem necessary to carry out the provisions of, and to exercise and perform his powers and duties under, this act." 49 U.S.C.A. § 1354(a).

Pursuant to the foregoing statutory powers, the Administrator has promulgated Part 77 of the Federal Aviation Regulations governing "Objects Affecting Navigable Airspace." See 14 C.F.R. §§ 77.1 et seq. The pertinent provisions of these regulations are divided into three subparts. Subpart B requires each person who proposes construction or alteration of a specified structure of given height and proximity to airports to *notify* the FAA of his proposal. 14 C.F.R. §§ 77.11, 77.13, 77.15. Once a proponent has notified the FAA of his proposed structure pursuant to Subpart B, the Administrator is equipped with the necessary information to determine the *possible* hazardous effect of the proposed structure. 14 C.F.R. § 77.11(b)(2). The Administrator then moves to Subpart C of the Regulations. Subpart C sets out the standards for "Obstructions to Navigation." Under these standards, objects are designated "obstructions to navigation" if they are of specified heights, specified proximity to airports, specified relationships to various geographic planes emanating from the surface of airports, etc. These standards are different from, and as a general rule, less stringent than, the standards requiring notice.[2] Thus, a proposed

---

* Senior Circuit Judge, 6th Circuit, sitting by designation.

1. Review is sought pursuant to 49 U.S. C.A. § 1486, which provides for judicial review of orders issued by the Civil

Aeronautics Board or the Federal Aviation Agency Administrator.

2. For example, Subpart B requires each sponsor who proposes any construction or alteration of more than 200 feet above

structure may be of such a height or other characteristic as to require its proponent to *notify* the Administrator under Subpart B, but not so high as to be designated an *"obstruction"* under Subpart C.

After a building proponent has notified the FAA of his proposed structure in accordance with Subpart B, the FAA issues an "acknowledgment of Notice of Proposed Construction or Alteration." 14 C.F.R. § 77.19. This Acknowledgement states that an aeronautical study of the proposed construction has resulted in one of three determinations: That the proposed construction or alteration

(1) Would not exceed any standard of Subpart C and would not be a hazard to air navigation,

(2) Would exceed a standard of Subpart C but would not be a hazard to air navigation, or

(3) Would exceed a standard of Subpart C and further aeronautical study is necessary to determine whether it would be a hazard to air navigation * * *.[3]

In the event the FAA determines that further study will be necessary, the sponsor of the structure may, within thirty days, request such further study, and, pending completion of the study, the proposal will be presumed a hazard to air navigation. 14 C.F.R. § 77.19(c)(3).

Thus, even after the Administrator has determined under Subpart C that a proposed structure is an "obstruction" to navigation, still further investigation is required before the final, and significant, determination is made that the proposed structure is, in addition, a "hazard" to air navigation. The standards for determining whether a structure is a "hazard" to air navigation are set out in Subpart D of Part 77, applying to the conduct of aeronautical studies of the effect of proposed construction on the use of air navigation facilities or navigable airspace by aircraft.

Under Subpart D, the FAA Regional Director of the region where the proposed structure would be located conducts the aeronautical study of the proposed structure. 14 C.F.R. § 77.35(a). Subpart D provides that the Regional Director may solicit comments from interested persons, examine possible revisions of the proposed structure that would eliminate the exceeding of the standards of Subpart C, and convene a meeting of interested persons for the purpose of "gathering all facts relevant to the effect of the proposed construction or alteration on the safe and efficient use of the navigable airspace." 14 C.F.R. § 77.35(b)(1), (3), (4). Subpart D then provides that the Regional Director will issue "a determination as to whether the proposed structure or alteration will be a hazard to air navigation" and will send copies of the determination to all known interested persons. 14 C.F.R. § 77.35(c). The Regional Director's determination is deemed final unless a petition for review is granted by the FAA Administrator. 14 C.F.R. § 77.35(c). If a petition for review is filed, the FAA Administrator examines the petition to determine whether a review will be made, either on the basis of written materials, or by way of a public hearing. 14 C.F.R. § 77.37(c)(1)–(2).

## II. FACTS

The instant case began when three Dallas corporations proposed the construction of three high-rise complexes to be built in downtown Dallas. The corporations enlisted the expertise of a Dallas firm of consulting engineers to "sponsor" the structures with the FAA. The sponsor, which was mindful of the FAA height and proximity standards, notified the FAA of the proposed construction, as required by Subpart B. These notices recognized that the proposed structures exceeded certain of the obstruction criteria of Subpart C, and therefore re-

the ground level at its site to notify the Administrator, but Subpart C provides that any existing object of a height greater than 500 feet above the ground level at the site of the construction is "an ob-

struction to air navigation." 14 C.F.R. §§ 77.13(a)(1), 77.23(a)(1).

3. *See* 14 C.F.R. § 77.19(c).

quested circularization of the proposal to interested parties without delaying to advise the sponsor that circularization would be required. Thereafter, the FAA acknowledged receipt of the sponsor's notice and informed it that further aeronautical study would be necessary to determine whether the structures would be a hazard to air navigation.[4] Notices of the aeronautical study to be conducted were then circulated to the users of the airspace and municipal parties in the local Dallas area. In response to these notices, four aircraft owners and/or pilots associations, including ALPA,[5] filed written objections to the proposed structures with the FAA. On July 11, 1969, the FAA Regional Director [6] held an informal hearing on the three proposals, and interested parties, including ALPA, presented data at the hearing. Thereafter, on August 5, 1969, the Regional Director issued his determination that each of the proposed structures would be a "hazard to air navigation." The Regional Director's determinations noted, however, that each was subject to review by the FAA Administrator if a petition for review should be filed by September 4, 1969. A further notation provided as follows:

> If a petition is filed further notice will be given and the determination will not become final pending disposition of the petition.

On September 2, 1969, the sponsor of the proposed structures petitioned the FAA Administrator for discretionary review. On November 25, 1969, the FAA issued a "Notice of Petition for and Grant of Review." This notice stated that the determinations "will be reviewed on the basis of written materials in accordance with 14 C.F.R. § 77.37(c) (1)," and that "interested parties may, within 30 days of the issuance of this notice, submit rele-

vant information in writing for consideration in the review."

On December 16, 1969, the sponsor of the proposed structures submitted responses to the FAA's November 25, 1969 grant of review, setting forth its reasons for objecting to the determination of "hazard." On December 29, 1969, the Air Transport Association of America, one of the four opponents of the proposed structure before the Regional Director,[7] lodged with the FAA a detailed opposition to the petition for review. None of the other groups who had opposed the proposals before the Regional Director— including ALPA—filed statements in opposition to the petition for review. On February 6, 1970, the FAA issued a determination of "No Hazard" reversing the Regional Director. Thereafter, on March 31, 1970, attorneys for ALPA filed an "application for rehearing" with the FAA which contended that ALPA had never received notice of the FAA's grant of review of the original determination of hazard, and argued further that, aside from the question of notice, the substantive decision of the Administrator in reversing the Regional Director was "erroneous and not supported by the facts nor by any evidence of record." On May 6, 1970, the FAA Administrator responded to ALPA's "application for rehearing" by letter, which stated, in pertinent part, the following:

> A review of your application for rehearing made in your petition of 31 of March 1970 indicates that it contains no information or data not considered when the original decision of "no hazard" was made. Part 77 does not authorize a rehearing as a matter of right and you were represented and had an opportunity to present your views at the informal airspace meeting held on 11 July. Under the circum-

---

4. *See* item (3) in text accompanying note 3 *supra*.

5. Written objections were also lodged by the Aircraft Owners and Pilots Association, the Air Transport Association of America, the National Business Aircraft Association, and by one fixed-based operator at Love Field.

6. The study was actually conducted by the Regional Director's "designee." *See* 14 C.F.R. § 77.35(b).

7. *See* note 5 *supra*.

stances there is no basis for granting a rehearing.

On April 3, 1970, ALPA filed with this Court the instant petition for review of the FAA's determination of no hazard dated February 6, 1970. ALPA repeats its complaint here that (1) it never received notice from the FAA that review of the sponsor's petition had been granted; and (2) that the Administrator's determination of "no hazard" was not supported by substantial evidence.

## III. REVIEWABILITY

■ At the outset we are met with a jurisdictional roadblock erected by the FAA, which they contend prohibits our review of their "no hazard" determination. Seizing upon language in the 1947 Supreme Court opinion, Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568, that "administrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process," 333 U.S. at 112–113, 68 S.Ct. at 437, the FAA argues that its "no hazard" determination neither imposes an obligation, denies a right, nor

fixes a legal relationship. They point out that their determination of hazard, or no hazard, has no enforceable effect. The determination merely declares that the proposed structure will, or will not, be a hazard to air navigation; and regardless of what determination the FAA makes, the proponent of the structure may proceed in his construction with impunity. The only effect of the determination, according to the FAA, is its power of "moral suasion."

Literally applied, the above-quoted formula from C & S Air Lines might preclude judicial review of the FAA determination of "no hazard" in this case. But C & S Air Lines is an old case,[8] and we have no doubt that the language there since has been replaced by the test for determining the reviewability of administrative actions enunciated in the recent Supreme Court cases Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Under these cases, the new, and obviously much more functional, test for

---

8. C & S Air Lines is also distinguishable from this case on its facts. The question presented in C & S Air Lines was whether there could be judicial review of CAB orders which are subject to approval by the President. The Court reasoned that until the decision of the Board had been approved by the President, it was not a final order, and was therefore not reviewable. After Presidential review, however, the order still was held to be not reviewable because it then "derive[d] its vitality from the exercise of unreviewable Presidential discretion." 333 U.S. at 113, 68 S.Ct. at 437.

The FAA also relies on an unpublished order of the United States Court of Appeals for the District of Columbia Circuit entered on a petition for review of a FAA determination that a proposed structure would be a hazard to air navigation. The D. C. Circuit disposed of the petition in a one-line per curiam as follows: This cause came on for consideration on the record from the Federal Aviation Agency, and was argued by counsel, and it appearing that the order on review herein does not "impose an obligation,

deny a right, or [sic] some legal obligation * * *" see C & S Airlines, Inc. [sic] v. Waterman Steamship Corp., 333 U.S. 103, 112–113, 68 S.Ct. 431, 437, it is

ORDERED by the court that the petition on review is hereby dismissed.

Potomac Electric Power Co. v. Halaby [No. 17,706, October 8, 1963]. A one-line, unpublished order is weak authority for the proposition that FAA determinations of "hazard" and "no hazard" are not reviewable.

We find this unpublished order additionally unpersuasive because of its reliance on C & S Air Lines, which, as we have indicated, has been undermined considerably by Abbott Laboratories. See also the recent published opinion of the D. C. Circuit in Chronicle Publishing Co. v. FCC, 125 U.S.App.D.C. 53, 366 F. 2d 632 (1966), which reviews the FCC's denial of an application for permission to increase the height of a TV antenna on grounds of an FAA determination that granting the application would result in a hazard to air navigation.

determining whether an administrative action is judicially reviewable is "whether the issues tendered are appropriate for judicial resolution," and whether "hardship [would result] to the parties if judicial relief [were] denied." Toilet Goods Ass'n, 387 U.S. at 162, 87 S.Ct. at 1523. This test is crowned with the caveat that "judicial review of a final agency action * * * will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories, 387 U.S. at 140, 87 S.Ct. at 1511.

■ Clearly, the first prong of the *Abbott Laboratories* test is satisfied in this case. The first matter we are asked to review is the fairness, under due process standards, of an agency procedure which allegedly failed to notify an interested party of an agency hearing. It is well-recognized, of course, that questions concerning the constitutionality, or procedural fairness, of agency actions, are peculiarly within the expertise of the courts. *See* 4 K. Davis, Treatise on Administrative Law §§ 30.07, 30.09 (1958 & 1970 Supp.). The other issue we are asked to review, should we decide the procedures were fair, is whether substantial evidence supports the agency determination. That consideration of an agency determination under the substantial evidence rule is an "issue appropriate for judicial resolution" is too well established to discuss. Suffice it to say that we are convinced that the first prong of the *Abbott Laboratories* test is satisfied by the issues presented for review here.

The second prong of the *Abbott Laboratories* test is undoubtedly the one the FAA would contend is not satisfied by the circumstances of this case. Since their determination has no enforceable effect, they would argue, there would be no demonstrable hardship to the parties if judicial review were denied. It may well be, as the FAA contends, that the only effectiveness of its determination of "no hazard" or "hazard" lies in the power of "moral suasion" ascribed to the determination. But it takes little knowl-

edge of the goings-on about us to be aware that "moral suasion" is a considerably potent force in our society. The FAA does not deny, to be sure, that its determination of "hazard to air navigation" either erects or removes, whichever the case may be, a practical "stumbling block" to the construction of the proposed buildings. Thus, if the FAA had determined finally that these structures would be hazards to air navigation, it is obvious that this determination would have constituted a considerable "stumbling block" to the proponents. For example, as a practical matter, it would unquestionably have been very difficult for the proponents of the proposed structures to secure financing or obtain insurance on a building that officially had been declared a "hazard to air navigation." Likewise, when the FAA has made a determination of "no hazard," it is equally obvious that affected parties opposing the structure, like ALPA, suffer a significant setback. Indeed, all the wind is taken out of their "safety" argument. For example, should they seek to arouse public reaction against the structures on grounds that the structures would be a "hazard" to air navigation, the proponents could point to an official determination that the structures are "not hazards" to counter the argument. Or, should the opposing parties seek to prevent construction of the buildings through some type of common-law action, the FAA's determination of "no hazard" would again be almost fatal to their cause of action. Compare Chronicle Publishing Co. v. FCC, 1966, 125 U.S.App. D.C. 53, 366 F.2d 632. To say, therefore, that the FAA's determination on the question of hazard is either practically, administratively, or legally insignificant is to ignore reality.

The FAA argues further, however, that even if we recognize the practical impact of its determination of "no hazard," the time is not yet ripe for review because even after the FAA determination of "no hazard" there is no assurance that the proposed structure will take place as studied by the FAA, or in-

deed in any form.[9] Thus, the FAA suggests, ALPA should wait until the proposed structures have been built and the FAA has had occasion to adjust the operating procedures for Love Field so that incoming and outgoing aircraft can "fly around" the buildings. Then, contends the FAA, if ALPA feels that the new operating procedures are inadequate, it may contest at that time. There are at least two flaws in this argument.

The most obvious flaw is that ALPA is not seeking review of the FAA modifications in operational procedures alone, but of the FAA determination that these buildings can be built as planned and operational procedures modified in such a way that no hazard to air navigation will result. To wait until after the buildings are built to evaluate the FAA's decision-making process on the problem would, of course, be sheer foolishness. It is the buildings in the first instance that raise the threat to air safety, and it is those buildings that create the necessity to modify the operational procedures. Quite obviously, a decision regarding the possibility of modifying operational procedures to "fly around" the buildings should be made before and not after the structures have been erected. Certainly, the regulatory purpose of the safety provisions administered by the FAA contemplates that administrative evaluation of the effect of a proposed structure on air navigation come before, not after, the structure has been built. Any other construction of the Administrator's power to determine the hazardous effects of a proposed structure would undermine the prophylactic design of the administrator's regulatory scheme. For the obvious aim of requiring an administrative determination on the effect of the project

is to induce in the construction of the project "voluntary" compliance with some Congressional purpose—like safety. Thus from the standpoint of effectuating Congressional intent, it is the Administrator's approval of the project in the first instance that becomes the all-important step in the process. And it is the Administrator's approval that should be the focal point of judicial review.

A second flaw in the FAA's argument that this Court should withhold review until some later date is that *now is the last time* before actual construction begins that ALPA effectively can urge enforcement of its view of the FAA safety criteria with respect to these proposed buildings. There is no question that ALPA has a right to urge its view of what is safe for air navigation; the Federal Aviation Act recognizes and declares to exist "in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States." 49 U.S.C.A. § 1304. Moreover, the chance that the structures may never be built is irrelevant. For, as we said above, our concern is not with the commencement of construction. It is with the removal of all administrative "stumbling blocks" to commencement of construction. And that contingency has occurred.

In short, we are convinced that we have jurisdiction to review an FAA determination of "no hazard" and that the time is now ripe to review it. We therefore proceed to ALPA's contentions that (1) it never received notice of the FAA's grant of review in this case and (2) that the FAA's determination of "no hazard" is not supported by substantial evidence. Since we have concluded that ALPA's right to due process of law was violated

9. The chance that construction of these proposed buildings will never take place is apparently more than speculative. The FAA informs us in its brief that, "although not reflected in the administrative record, * * * since the time of the determination of 'no hazard,' * * * Ling-Tempco-Vought [a proponent of one of the buildings] has sold its rights to the First National Bank of Dallas * * *

and Dallas Texas Corporation [another proponent of a building] has been embroiled in financial reorganization * * * and no work has started other than clearing the lot in preparation for construction. Further, Griffin Square, Ltd., [the third proponent] has plans to redesign the building and intends to proceed once finance is straightened away."

in the FAA's grant of review without notice to ALPA, we do not reach ALPA's substantive complaint.

## IV. NOTICE

ALPA urges that we require the FAA to reopen its review of this case because of ALPA's claim that it received no notice of the Administrator's grant of review and therefore was deprived of an opportunity to oppose the petition for review.

The FAA contends that notice of the Administrator's decision to grant review was mailed to ALPA. The Record shows the following: On November 25, 1969, a "Notice of Petition and Grant of Review" was *issued* in Washington. No certificate of service was attached to this notice. On December 2, 1969, the FAA office in Washington sent *an interoffice memorandum* to the Regional FAA office in Dallas reciting that copies of the November 25 notice had been sent to several organizations, including ALPA. Attached to this interoffice memorandum was a mailing list, which included Mr. Charles H. Ruby, President of ALPA. Yet, again, no certificate of service verifying that notice had been served on ALPA or Mr. Ruby was attached to this list. Thus, at the time the Administrator rendered his final determination of "no hazard" on these proposed structures there was no proof in the administrative record that notice had been served on ALPA. Almost two months after the Administrator's decision was announced, ALPA filed its "application for rehearing," claiming that it never had received notice of the Grant of Review. As set out fully above, the FAA denied this application for rehearing; in doing so, it made no mention of ALPA's claim that it never received notice. Then, in June 1970, the FAA for the first time

offered documentation of its claimed mailing of notice to ALPA. At that time, FAA officials placed in the FAA Record a "Certificate of Service" made by Miss Constance D. Harris, the Secretary to the Assistant Chief of the FAA Air Traffic Service. This Certificate stated that on or about December 2, 1969, Miss Harris mailed a copy of the November 25, 1969 notice to the President of ALPA at his Washington office.

The problem thus boils down to one of proof. We by no means can say that this Record establishes conclusively that the FAA sent *no* notice to ALPA. We find, however, that we are also unable to conclude from the Record that a notice *was* sent. And we think the burden is clearly on the FAA to demonstrate that the notice was mailed. We are unwilling to rely on the FAA's post-review attempt to cure the Record on this point by inserting a "Certificate of Service" in the Record five months after the Administrator had handed down his final determination. We cannot ignore the fact that ALPA did not participate in the Administrator's review of this case until after the final decision had been announced. One inference to be drawn from ALPA's nonparticipation is that it received no notice that Review had been granted. In view of ALPA's opposition before the Regional Director and its vigorous objection after the Administrator's decision was announced, this would be a reasonable inference to draw. To counter this inference, unfortunately, the FAA can point to no conclusive proof that notice was mailed to ALPA in the administrative record as that record stood when the Administrator announced his final decision.[10] At oral argument, counsel for the FAA was unable to explain the absence of proof of service from the Record, but suggested that it might

10. We do not intend to suggest in any way that the Administrator intentionally either sent no notice to ALPA or "doctored" the Record once he discovered the absence of proof of service therein. There is certainly no evidence in this Record to indicate that the Administrator is guilty of any wrongdoing. As a matter of fact, as we stated in the text, there is no conclusive evidence that notice was *not* sent to ALPA. This whole controversy seems to have resulted from an unfortunate error committed either at the time the FAA's notices were mailed out or in compiling the administrative record in this case.

have resulted from an oversight. What troubles us is that through a similar oversight, the FAA may indeed have failed to *send* a notice to ALPA.

The FAA argues that even if notice was not sent, ALPA had a full opportunity to, and did, present all its opposing data and arguments in its "application for rehearing," and that the FAA gave ALPA's materials full consideration. We cannot accept this argument. The post-hoc consideration which ALPA's application received cannot possibly be a fair substitute for that initial look a decision-maker gives to a matter when he has *all* the material before him for the first time. ALPA must have an opportunity to have its objections considered on an equal footing with all the other data and arguments presented to the Administrator in this case. Only by re-opening the case and considering anew the data and arguments presented by all parties—including ALPA—can the FAA satisfy the requirements of due process.

It is so ordered.