586 F.2d 644
 1978-2 Trade Cases 62,198
 Joseph R. KAPP, Plaintiff-Appellant,
v.
NATIONAL FOOTBALL LEAGUE, an unincorporated association, et
al., Defendants-Appellees.
Joseph R. KAPP, Plaintiff-Appellee,
v.
NEW ENGLAND PATRIOTS FOOTBALL CLUB, INC., Defendant-Appellant.
Joseph R. KAPP, Plaintiff-Appellee,
v.
NATIONAL FOOTBALL LEAGUE, an unincorporated association, et
al., Defendant-Appellant.
 Nos. 76-2849, 76-2878 and 76-2879.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 4, 1978.
As Amended on Denial of Rehearing and Rehearing En Banc Nov. 22, 1978.
 
 Moses Lasky (argued), of Brobeck, Phleger & Harrison, San Francisco, Cal., for plaintiff-appellant.
 Paul J. Tagliabue (argued), of Covington & Burling, Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before MERRILL, TRASK and CHOY, Circuit Judges.
 TRASK, Circuit Judge:
 
 
 1
 This appeal is the result of several years of litigation concerning former professional football quarterback Joseph Kapp and his relationship with the National Football League (NFL). Kapp originally filed suit against the NFL, its 26 member clubs, its Commissioner, Alvin Ray "Pete" Rozelle and other named individuals. He alleged that certain rules of the NFL violated the antitrust laws and caused his unlawful expulsion from professional football in 1971. In addition, he claimed that the New England Patriots breached an alleged contract with him. The Patriots counterclaimed against Kapp.
 
 
 2
 Kapp moved for partial summary judgment on the antitrust issues. This resulted in a finding by the district court that the challenged rules violated the antitrust laws. Kapp v. National Football League, 390 F.Supp. 73 (N.D.Cal.1974).
 
 
 3
 For a clear understanding of what the court held in granting this partial summary judgment, some background is necessary. The NFL is an unincorporated association consisting of member clubs, which own and operate professional football teams. The League schedules contests among the various teams, promulgates rules intended to resolve disputes and promotes the welfare of the teams and their players, and performs other administrative tasks. Since 1960, Pete Rozelle has been the League's Commissioner and chief executive officer. The NFL provisions which Kapp attacked are set out below.
 
 
 4
 The draft rule. The "draft" rule contained in Article 14 of the NFL Constitution provides that at an annual meeting the member clubs would select prospective players, principally from the ranks of the outstanding college and university graduates. The effect of this rule is to prevent other teams from negotiating with a player, even if the selecting club made an unacceptable contractual offer to him.
 
 
 5
 The tampering rule. To prevent interference with the selecting club's right to its draft choices and active players, the "tampering" rule of Article 9.2 provides that a club may not negotiate with, or make an offer to, another team's player.
 
 
 6
 Standard Player Contract. Before a player can participate in the NFL, he must sign a Standard Player Contract. This was part of the 1968 collective bargaining agreement, the 1970 collective bargaining agreement, and appears in Article 15 of the 1971 NFL Constitution. The Contract provides that the player becomes bound by "the Constitution and By-laws, the Rules of the League, of the Club, and the decisions of the Commissioner of the League. . . ." Specific terms such as salary, length of contract, and other matters were incorporated into the Standard Player Contract for each player.
 
 
 7
 The option rule. This rule gave the employing club a unilateral right to renew a player's expired contract for an additional year at a reduced rate of compensation, which could not be less than 90 percent of his compensation for the previous year. This rule was intended to induce a player to renew his contract, and not "play out his option" so as to be free to negotiate with other clubs.
 
 
 8
 The Rozelle Rule. Even after a player becomes a free agent, another club could not employ him until it complied with the "ransom" or "Rozelle Rule" of Article 12.1(H) of the Constitution. This rule provides that the new employing club may not sign a contract with a free agent unless it first makes "satisfactory arrangements" with the former employing club, or, if these are impossible, employ the free agent subject to the unreviewable power of Commissioner Rozelle to award one or more players to the former employing club from the acquiring club's active, reserve, or selection list.
 
 
 9
 The district court examined these provisions and found that under a "reasonableness" analysis, the antitrust laws had been violated. 390 F.Supp. at 82-83. Specifically, the district court found the Rozelle Rule to be an unreasonable restraint under any legal test.[1] The draft rule was also found to be unreasonable. Finally, the tampering rule and the Standard Player Contract were found to be unreasonable, but only "insofar as they are used to enforce other NFL rules in that area." The court did conclude that the option rule could not be found unreasonable on partial summary judgment.
 
 
 10
 In defense, the NFL had asserted that all of the challenged rules were part of both the 1968 and 1970 collective bargaining agreements negotiated between the National Football League Players' Association (NFLPA) and the NFL. This could have placed the rules outside the coverage of the antitrust laws under the labor exemption. See Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). But the district court found that at the time Kapp was allegedly forced out of professional football, no collective bargaining agreement was in effect. This was due to the fact that the 1968 contract had expired in February 1970 and the new contract for 1970-74 was not signed until June 1971.
 
 
 11
 The defendants attempted to have this decision certified for interlocutory appeal under 28 U.S.C. § 1292(b), but the district court denied the motion.
 
 
 12
 The matter then proceeded to a jury trial. The trial court, in its partial summary judgment, reserved for trial the issue of whether NFL enforcement of the provisions found violative of the antitrust laws could be deemed to have been the cause of Kapp's damages.
 
 
 13
 At trial, Kapp's involvement with the NFL was outlined. In 1959, the NFL Washington Redskins drafted Kapp, then a college player at the University of California. Instead of playing for the Redskins, Kapp joined the Canadian Football League (CFL), where he played from 1959-66. During this time, the Redskins kept Kapp on their reserve list, thus barring other NFL teams from negotiating with him.
 
 
 14
 During 1966, the year that his last Canadian contract expired (subject to an option of the Canadian team to renew the contract for 1967), Kapp conducted negotiations with the Houston Oilers of the then existing American Football League (AFL). He signed a contract with the Oilers on February 10, 1967, but on April 12, 1967, Commissioner Rozelle and the President of the AFL, acting together, declared this contract invalid, apparently because of an understanding among the NFL, the AFL, and the CFL that players would not be permitted to negotiate during their contract periods to move from one league to another.
 
 
 15
 On September 3, 1967, Kapp signed a two-year contract with the Minnesota Vikings of the NFL. This contract was the Standard Player Contract, and incorporated a memo agreement on Kapp's compensation and special terms. The Vikings paid Kapp's Canadian team $50,000 for his release, and made satisfactory arrangements with the Washington Redskins for any claim to Kapp which they had. Kapp played for the Vikings during the 1967 and 1968 seasons; he also played with them during the 1969 season, after they exercised their option for a third year. The Vikings then offered Kapp another two-year contract on the same terms as his original one, but he refused to sign it. The Philadelphia Eagles and the Houston Oilers also expressed interest in Kapp, but neither team made a firm offer. Kapp claimed that the teams were restrained by the Rozelle Rule, which would have required them to pay "ransom" to the Vikings.
 
 
 16
 The New England Patriots, however, were willing and able to make "satisfactory arrangements" with the Vikings in exchange for the right to Kapp's services. They gave the Vikings their first round draft choice for 1972, in addition to the player they had selected first in the 1967 draft. After the conclusion of this agreement, the Patriots and Kapp executed a memo agreement on October 6, 1970. In exchange for a total compensation of $600,000, Kapp agreed to play with the Patriots for the remainder of the 1970 season and for the entire 1971-72 seasons.
 
 
 17
 Kapp played for the remainder of the 1970 season under this agreement. In January 1971, the Patriots acted pursuant to the NFL Constitution in sending Kapp a Standard Player Contract, which the Constitution required him to sign. As we have discussed, upon signing the Standard Player Contract, the player became bound by all the rules contained in the Constitution and the contract itself. Those included the draft rule, the tampering rule, the option rule, the Rozelle Rule, and the one-man rule. Kapp, however, refused to sign the contract.
 
 
 18
 On May 28, 1971, Commissioner Rozelle reminded the Patriots that the NFL Constitution required a player to sign a Standard Player Contract before he could play in a game or practice with his club. The Patriots permitted Kapp to report to their training camp in June of 1971, but they insisted that he sign the contract. When he continued in his refusal to sign, they told him he would have to leave the camp. On July 16, 1971, Kapp left the Patriots' training camp and severed his ties to this club, although the Patriots did retain him on their reserve list until 1972. Pursuant to a grievance procedure instituted by the member clubs after Kapp's departure, Rozelle reaffirmed his previous decision that Kapp was required to sign a Standard Player Contract as a condition of his participation in professional football.
 
 
 19
 After a lengthy trial, the jury found that Kapp could not prove he had been damaged by the general illegality of the rules used by the NFL. A verdict was returned against Kapp on all issues upon which he sought relief. Kapp's appeal from the trial findings focuses primarily on the court's instructions to the jury. He claims they erroneously stated the law to his prejudice.
 
 
 20
 * Kapp's major contention is that the instructions did not direct the jury to find damages based solely on the fact the antitrust laws were violated. The contextual setting of this case has all the appearances of a group boycott of the type condemned as Per se unlawful in Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). But that fact alone does not automatically give rise to damages. Section 4 of the Clayton Act, 15 U.S.C. § 15, requires proof of injury.[2] E. G., In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 125-26 (9th Cir.), Cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). The court properly instructed the jury that there must be a causal relationship between the illegality, if any, and the injury if proved.[3]
 
 
 21
 The requirement of cause and effect or "impact" was not new in this litigation when the jury instructions were proposed. In the pretrial order of February 12, 1976, before trial set for February 23, 1976, the court advised all counsel that the impact of the NFL's alleged unlawful rules would have to be shown.
 
 
 22
 The district court's approach to this issue was proper. The mere fact that some of the NFL's rules were found violative of the antitrust laws does not automatically produce damages for Kapp. He must prove that he was injured "by reason of" one of the unlawful practices. In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, supra. The Supreme Court has recently ruled that the only damages recoverable in an antitrust suit are those which occur by reason of that which made the defendant's actions unlawful. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977):
 
 
 23
 "Plaintiff must prove Antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100 at 125, 89 S.Ct. 1562, 23 L.Ed.2d 129."
 
 
 24
 Even accepting that the restraints imposed by the challenged rules were unlawful under the Sherman Act, a jury question still remains as to whether, under the Clayton Act, those unlawful restraints were the cause of any loss Kapp may have suffered through his failure to play for the Patriots. The defendant's theory as argued to the jury was that for personal reasons of his own Kapp had decided to discontinue playing football, that he had decided to seek less strenuous employment in the entertainment field, that his only interest in professional football now lay in attempting to recover threefold any financial loss he may have suffered through his election not to play.
 
 
 25
 That Kapp's principal concern was not with the ability to play professional football free from the restraints imposed by the rules is strongly suggested by the fact that he was urged by both the Patriots and the League to sign a Standard Player Contract with the right reserved to challenge the rules should they be applied against him in the future.
 
 II
 
 26
 Kapp also challenges the manner in which the jury was instructed regarding his contract and tort claims against the Patriots and the NFL. He argues that the jury was impermissibly allowed to decide whether a contract actually existed between himself and the Patriots, claiming this was a matter of law for the court to decide. But, whether a contract exists is a matter of law only when the facts are undisputed. Bell v. Ralston Purina Co., 257 F.2d 31 (10th Cir. 1958). Here, the intention of the parties as to whether the terms of the initial agreement would be incorporated into the Standard Player Contract was in dispute. In this circumstance, it is for the jury to decide whether a contract exists. Osborn v. Boeing Airplane Co., 309 F.2d 99, 103 (9th Cir. 1962). In that regard, the court instructed on both the contract claims and the tort claims.[4] These instructions properly stated the legal principles from which the jury could make its decision. The jury by its verdict found against the plaintiff and for the defendants, not only on the contract claims but also on the tort claims.
 
 III
 
 27
 The NFL has filed a cross-appeal from the summary judgment of the district court holding the challenged rules to have violated the antitrust laws. It contends that summary judgment was premature since controverted factual issues (including the application of the labor exemption to the contested provisions) remained to be resolved by trial.
 
 
 28
 Our holding on Kapp's appeal is that even if the challenged rules violated the Sherman Act, Kapp did not prove damage under the Clayton Act. Such a holding makes it unnecessary for us to reach the issue presented by the cross-appeal. By upholding the jury verdict, our holding also serves to eliminate any harm the NFL may have suffered by virtue of the summary judgment and to deprive the NFL of its standing as grievant. Thus, the appeal in effect has been rendered moot. See Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939); Lindheimer v. Illinois Tel. Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934).
 
 
 29
 On Kapp's appeal judgment is affirmed. The appeal of the NFL is dismissed.
 
 
 
 [1]
 See Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976). In Mackey, after a full trial on the merits, the court determined that the Rozelle Rule was unduly restrictive and unlawful under the antitrust laws. It also determined that the labor exemption to the antitrust laws, See Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), might apply to the Rozelle Rule if it had been a subject of bargaining. But, the court found that the Rozelle Rule was not a bargainable item in negotiations between the NFL and the players' union. As a consequence, the labor exemption could not apply. We decline to offer advice as to the collateral estoppel effect the Mackey decision has against the NFL on this issue under Blonder-Tongue v. University Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)
 
 
 [2]
 "Any person Who shall be injured in his business or property By reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15 (Emphasis added)
 
 
 [3]
 Jury instruction 5 read:
 "5. From what I have said thus far, you will note that the main issue of fact which you are to decide in connection with this antitrust claim is whether, assuming, as you must, the illegality of the NFL constitution and bylaws in the respects adjudged by the Court, plaintiff has sustained injury to his business which can be said to have been proximately caused by reasons of such combination of defendants, and if so, the amount of damages, if any, in terms of money by him sustained." R.T. 3403.
 
 
 [4]
 As to the contract claims, the court said, in part:
 'You make take put it this way: On the issue of the terms and meaning of the 10-6-70 memo contract, I instruct you that the burden rests upon the plaintiff to prove, not only the existence of that agreement, but its terms as intended by both parties, within the meaning of my instructions.
 'Therefore, if you find from the evidence in this case that, although neither party mentioned the matter of signing a Standard Player Contract during the negotiations for the memo agreement, and although such no such matter appears in the written memo agreement, it was, nevertheless intended and assumed by both parties that, in light of usage and customary practice within the meaning of my instructions, plaintiff was to sign also the Standard Player Contract, then plaintiff would have been contractually bound to sign the Standard Player Contract; and since he refused to do so, he could not, if you so find, recover against the Patriots on his contract claim in this case.
 'On the other hand, if you find from the evidence that this October 6th, '70 memo agreement that the signing of that that the signing of a Standard Player Contract by the plaintiff was not within the intent of the parties, then of course, the Patriots would be in breach of the 10-6-70 memo agreement by requiring plaintiff to so sign a Standard Player Contract as a condition of Patriots' further performance of that contract, or that memo agreement; and plaintiff would be entitled on such findings to recover on his contract claim against the Patriots the balance that he would have been paid under the memo agreement.' R.T. at 3774-75.
 'As to the tort claims the court defined the nature of the alleged tort claims and instructed in pertinent part:
 'Now, if you should find from the evidence, considered in the light of these instructions, in favor of the plaintiff on his claim against all the defendants, other than the Patriots, of wrongful interference with his contractual or business relationships with the Patriots, you may award such damages against the defendants; that is, such of them as are so found to have wrongfully so interfered, and you can award such damages as you find were proximately caused as a result of such defendant's wrongful inducement or interference, including, in this kind of an award, in addition to any loss of expectable earnings by the plaintiff, such damages for mental suffering, if any, as was so proximately caused to the plaintiff.' R.T. 3780-81.