**INTERNOR TRADE, INC. and Petrobras Comercio International S.A. Interbras, Plaintiffs,**

v.

**UNITED STATES and Malcolm Baldrige, Secretary of Commerce, Defendants.**

**Court No. 86–04–00510.**

United States Court of International Trade.

Dec. 23, 1986.

Rogers & Wells (Eugene T. Rossides and Robert E. Ruggeri) Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Elizabeth C. Seastrum) for defendants; Andrea E. Migdal, U.S. Dept. of Commerce, Washington, D.C., of counsel.

## OPINION AND ORDER

AQUILINO, Judge:

The government urges dismissal of this action brought pursuant to section 623 of the Trade and Tariff Act of 1984, 19 U.S.C. § 1516a(a)(3), primarily on the Department of Commerce's interpretation of the legislative intent underlying enactment of that statute. Though ably presented, the motion must be denied, as was also the case in *Canadian Meat Council v. United States*, 10 CIT ——, 644 F.Supp. 1125 (1986).

### Background

In 1985, the Ad Hoc Committee of Domestic Fuel Ethanol Producers filed petitions with the International Trade Administration ("ITA") and the International Trade Commission ("ITC") alleging that fuel ethanol imported from Brazil was being sold in the United States at less than fair value and that such imports were causing or threatening to cause material injury to the domestic industry. The domestic producers thereafter requested that the ITA also investigate trading-company dumping upon an allegation that middlemen were selling the ethanol at prices below the cost of acquisition, exportation and marketing. The ITA initiated such an investigation of Petrobras Comercio International S.A. In-

terbras ("Interbras"), one of the two plain-tiffs herein.[1]

The ITA made a preliminary determination of sales at less than fair value and set a preliminary dumping margin for Interbras of 119.02% *ad valorem*. *See* 50 Fed. Reg. 38,871 (Sept. 25, 1985). In its final determination, the agency found Interbras sales at less than acquisition cost and pre-scribed a dumping margin of 101.12% *ad valorem*. *See* 51 Fed.Reg. 5,572, 5,573 and 5,579 (Feb. 14, 1986).

No antidumping-duty order has been published, however, since the ITC deter-mined that the domestic producers were not materially injured or threatened with material injury, and the establishment of an industry in the United States is not materially retarded, by reason of imports from Brazil of certain ethyl alcohol.[2]

The plaintiffs commenced this action, alleging jurisdiction under 28 U.S.C. § 1581(c) ("[t]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930"). The defendant United States has interposed a motion to dismiss on the ground of lack of subject-matter jurisdiction. The primary point pressed, as indicated above, is statu-tory, but the motion papers state that, if the court overrules that point, then decid-ing the merits of this action would require rendering an advisory opinion prohibited by Article III of the Constitution. *See, e.g.,* Defendant's Memorandum, pp. 13–14.

### Discussion

### I

■ Section 1516a(a)(2) of Title 19, U.S.C. has provided for commencement of actions in this Court of International Trade within 30 days of publication in the Federal Register of antidumping-duty orders to re-view final affirmative ITA determinations underlying such orders. In 1984, Congress enacted the Trade and Tariff Act, section 623 of which was entitled "Elimination of Interlocutory Appeals". Subparagraph (a)(4) of this section stated:

Redesignate paragraph (3) [of 19 U.S.C. § 1516a(a) (1979)] as paragraph (4) and after paragraph (2) insert the following:

"(3) EXCEPTION.—Notwithstanding the limitation imposed by paragraph (2)(A)(ii) of this subsection, a final affirm-ative determination by the administering authority under section 705 or 735 of this Act may be contested by commencing an action, in accordance with the provisions of paragraph (2)(A), within thirty days after the date of publication in the Feder-al Register of a final negative determina-tion by the Commission under section 705 or 735 of this Act.".

Defendant's counsel admit, as they must, that:

On its face this provision appears to grant Internor the right to seek judicial review of the ITA final affirmative anti-dumping determination, even though the ITC made a negative injury determina-tion and, as a consequence, no antidump-ing duty order was published. Defend-ant's Memorandum, pp. 3–4.

Nevertheless, they contend that Congress made a mistake. *Id.* at 11. That is, section 623(a)(4) of H.R. 3398, 98th Cong., 2d Sess. (1984) conditioned the above-quoted excep-tion on a final negative determination by the Commission under section 705 or 735 "which is predicated upon the size of either the dumping margin or net subsidy deter-mined to exist." Counsel describe the dele-

---

1. Paragraph 3 of the complaint alleges their respective roles in the marketing of ethanol to be as follows:

    ... Internor, a New York corporation, is the U.S. subsidiary of Interbras which is wholly owned by Petrobras, a Brazilian corporation. Internor is a U.S. importer, and Interbras a Brazilian exporter, of the fuel ethanol from Brazil under investigation in this matter. Neither of the Plaintiffs, nor Petrobras, manu-factures fuel ethanol. Interbras and Petro-bras purchase ethanol in Brazil for export and domestic sales, respectively.

2. *See Certain Ethyl Alcohol from Brazil,* USITC Pub. 1818 at 1 (March 1986); 51 Fed.Reg. 9,538 (March 19, 1986). This decision is being chal-lenged by the domestic producers in *Ad Hoc Committee of Domestic Fuel Ethanol Producers v. United States,* Court No. 86–03–00376.

tion of this condition in the act, as passed, in the following manner:

The language limiting the application of section 516a(a)(3) to a negative ITC determination using margins analysis survived through the report of the Conference Committee on the Trade and Tariff Act of 1984, dated October 5, 1984. *See* H.Conf.Rep. No. 98–1156, 98th Cong.2d Sess. 92, 179.... At the eleventh hour, however, the "exception" as finally enrolled in section 516a(a)(3) was shorn of the clause limiting its application to cases where the ITC used margins analysis. A resolution by Congressman Rostenkowski accomplished the ministerial act of eliminating the limitation clause, six days after the Conference Committee report cited above. 130 Cong.Rec. H12213 (daily ed. October 11, 1984). Congressman Rostenkowski's resolution was part of a last-minute concurrent resolution submitted to correct technical errors in H.R. 3398, the Trade and Tariff Act of 1984. *Id.* Unfortunately, in its effect, this "correction" was not at all technical. Defendant's Memorandum, pp. 8–9.

And they would therefore have the court draw the following conclusion:

... Most probably Congress intended to delete the "exception" altogether. Since it failed to do so, in the last minute of legislative business, a common sense interpretation of the provision requires that it be limited to the few instances in which the ITC has used margins analysis in arriving at its determination. Since that is not the case here, Internor possesses no right to obtain judicial review under this provision. *Id.* at 13.

Whatever the degree of perspicacity or logic of their thesis, this court must nevertheless apply the statute that Congress enacted, and the provision passed in the 1984

act was within the scope of the proposed modifications considered by Congress.[3] It is an elementary principle of statutory construction that " '[t]he starting point in every case involving construction of a statute is the language itself' ". *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J. concurring)). *See also American Lamb Co. v. United States,* 785 F.2d 994, 1002 (Fed.Cir.1986) ("[w]e begin with the best source of congressional intent, the statute"). As the court recently reiterated in *Al Tech Specialty Steel Corp. v. United States,* 10 CIT ——, 651 F.Supp. 1421, 1425 (1986), "[i]t is an established principle of jurisprudence that where a statute's meaning is clear, that meaning will be controlling, even if relevant legislative history suggests another plausible interpretation".

The text of the provision at issue is not ambiguous, and this court is not at liberty to interpret that language as if it were otherwise. *See Canadian Meat Council v. United States,* 10 CIT at ——, 644 F.Supp. at 1127. Of course, section 623 of the 1984 act was entitled as pointed out above, page 4, but, as the Supreme Court stated in *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947):

... [T]he title of a statute and the heading of a section cannot limit the plain meaning of the text.... For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain. [citations omitted]

---

**3.** For example, a proposal made on behalf of a number of domestic industries would have made reviewable

[a]ny final negative or final affirmative determination by the Secretary, the administering authority, or the Commission under section 303, 705, or 735 of this Act, whether or not the

other agency determination (administering authority or Commission) is affirmative or negative.

*Options to Improve the Trade Remedy Laws, Hearings before the Subcomm. on Trade of the House Comm. on Ways and Means,* 98th Cong., 1st Sess. 795 (1983).

## II

■ Essentially, defendant's contention of unconstitutionality addresses the ripeness of this action. The purpose of the ripeness doctrine

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The test for determining ripeness requires courts "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration". *Id.* at 149, 87 S.Ct. at 1515.

In *Canadian Meat Council v. United States, supra,* the claim of unconstitutionality was rejected by the court, which concluded that a "final affirmative subsidy determination is an action from which legal consequences flow, having a substantial impact on the rights of the parties". 10 CIT at ——, 644 F.Supp. at 1128 (citation omitted). Therefore, "[i]t is within the Court's power under Article III of the Constitution" to hear such cases "as required by section 1516a(a)(3)". *Id.* This court concurs.

The government is concerned that "a decision by this Court on plaintiffs' challenge to the ITA's affirmative determination could well prove advisory ... if the negative ITC determination, which is challenged in a separate law suit in this Court, is sustained". Defendant's Memorandum, p. 14. But even if this were true, the court would not have to stray into a prediction of future events [4] since the appeal of the ITC

determination has been assigned to this same judge.

This type of action is analogous to a protective cross-appeal filed by a defendant that has prevailed on the issue of damages but has lost on liability. The defendant can cross-appeal the liability judgment if the plaintiff appeals on damages. *See, e.g., Kapp v. National Football League,* 586 F.2d 644 (9th Cir.1978) (*en banc*), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). In *Kapp,* the cross-appeal was found to be moot, but only after the judgment on damages had been upheld. *See* 586 F.2d at 650.

In *Canadian Meat Council,* Commerce attempted to distinguish *Kapp* since the defendant would have lost its right to contest the liability issue if it had not filed a cross-appeal. That is, had the appellate court reversed on damages, the defendant would have had no redress. The argument was that the "statutory frame work provides ... an explicit, unequivocal right to seek judicial review of the ITA affirmative determination if and when the ITC negative injury determination is reversed".[5]

This distinction, however, does not affect ripeness. The plaintiffs indeed have a stake in the outcome of this action to review the less-than-fair-value ITA determination, regardless of whether or not an antidumping-duty order ever issues. Dumping has been described as one "of the most pernicious practices which distort international trade to the disadvantage of United States commerce"[6], and a finding thereof could be used to the detriment of the plaintiffs if a future investigation were initiated and "critical circumstances" alleged. Under the law, critical circumstances can be found where an importer "knew or should have known that the exporter was selling the merchandise which is the

4. *See American Spring Wire Corp. v. United States,* 6 CIT 122, 124, 569 F.Supp. 73, 75 (1983).

5. Defendant's Reply to Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, pp. 15–16 (filed on March 3, 1986 in *Canadian Meat*

*Council v. United States,* Court No. 85–09–01168).

6. S.Rep. No. 249, 96th Cong., 2d Sess. 37 (1979), U.S.Code Cong. & Admin.News 1979 pp. 381, 423.

subject of the investigation at less than its fair value". 19 U.S.C. § 1673d(a)(3)(A)(ii).

While the question of a future investigation is, of course, speculative, Article III of the Constitution permits suits such as this one to proceed. For example, the Court in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), held that a convict who had served fully his sentence is not barred from appealing the conviction as the

> conviction may be used to impeach his character should he choose to put it in issue at any future criminal trial ... and that it must be submitted to a trial judge for his consideration in sentencing should Sibron again be convicted of a crime.

392 U.S. at 55–56, 88 S.Ct. at 1899. Though *Sibron* was a criminal case involving mootness, the Court's rationale that "it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time"[7] applies equally here. In *Straus Communications, Inc. v. F.C.C.*, 530 F.2d 1001 (D.C.Cir.1976), the court found that a letter from the Federal Communications Commission indicating a violation by a radio station was reviewable as

> in all likelihood ... future violations by this station would stand to suffer harsher treatment than similar violations by other stations. This probability is enough to establish a present effect sufficient to make the letter a final order ripe for review on the petition of the station. *Id.* at 1006–07 (footnote omitted).

■ Furthermore, it is well settled that "agency action may be reviewable even though it is *never* to have any formal, legal effect". *Continental Air Lines, Inc. v. C.A.B.*, 522 F.2d 107, 124 (D.C.Cir.1975) (*en banc*) (emphasis in original). In *Air Line Pilots' Ass'n Int'l v. Department of Transp., Federal Aviation Admin.*, 446

F.2d 236 (5th Cir.1971), the court found an FAA determination that a proposed structure would present "no hazard" to air navigation to be ripe for review. The court rejected the FAA's argument

> that its "no hazard" determination neither imposes an obligation, denies a right, nor fixes a legal relationship.... The determination merely declares that the proposed structure will, or will not, be a hazard to air navigation; and regardless of what determination the FAA makes, the proponent of the structure may proceed in his construction with impunity. The only effect of the determination ... is its power of "moral suasion." 446 F.2d at 240.

The court found that "it takes little knowledge of the goings-on about us to be aware that 'moral suasion' is a considerably potent force in our society". *Id.* at 241. The court continued that

> should they seek to arouse public reaction against the structures on grounds that the structures would be a "hazard" to air navagation, the proponents could point to an official determination that the structures are "not hazards". *Id.*

■ This action is somewhat comparable, as the plaintiffs claim to fear that the ITA determination will affect their credibility. *See* Plaintiffs' Response, p. 21. The government reply that "Internor may just as well promote the ITC *negative* injury determination as proving its innocence of injurious dumping, as the domestic ethanol producers may tout the ITA affirmative determination as proof of their claims"[8] misses the point that the ITC determination does not deny the existence of less-than-fair-value sales. Additionally, ITC Commissioner Eckes dissented, stating that

> it is arguable that some members of the majority may not have applied properly the statute, legislative history, and existing case law to the facts at hand. Indeed, some seem determined to revise the statute under the thin veil of adminis-

---

7. 392 U.S. at 57, 88 S.Ct. at 1899.

8. Defendant's Reply, p. 14 (emphasis in original).

trative discretion. USITC Pub. 1818 at 41.

Thus, promotion of the ITC position might not repair the harm that the ITA determination allegedly is causing the plaintiffs.

Having evaluated plaintiffs' claim of harm under the *Abbott Laboratories* test, this court concludes that this action is ripe. The interest in delaying review of the ITA's final determination until issuance of any antidumping-duty order does not outweigh the adverse impact of that final determination on the plaintiffs. *Cf. Continental Air Lines, Inc. v. C.A.B.*, 522 F.2d

at 125. And judicial resources will not be wasted due to the assignment of the related ITC action to the undersigned.

In view of the foregoing, defendant's motion to dismiss must be denied.

So ordered.