**FLOWERS MILL ASSOCIATES, a general partnership, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 154–89 L.

United States Claims Court.

May 22, 1991.

---

Marc B. Kaplin, Blue Bell, Pa., for plaintiff.

John Gregory, with whom were Acting Asst. Atty. Gen. Donald A. Carr and James E. Brookshire, Washington, D.C., for defendant. Patricia R. Lane, Federal Aviation Admin., of counsel.

## OPINION AND ORDER

TURNER, Judge.

Plaintiff asserts a regulatory taking claim based on a determination by the Federal Aviation Administration that a building which plaintiff proposed to erect on land adjacent to an airport would constitute a hazard to air navigation. Flowers Mill alleges that the FAA determination deprives it of all use and enjoyment of its property thereby entitling it to just compensation under the Fifth Amendment. The case stands on defendant's motion to dismiss the complaint on the ground that Flowers Mill has failed to state a claim upon which relief could be granted.[1]

Plaintiff's taking claim is based on the practical effect of the FAA determination. While there may be practical consequences to an FAA finding of hazard which present obstacles to desired development (e.g., adverse impact on availability of financing and casualty insurance coverage), the FAA determination is advisory only and has no enforceable legal effect. For this reason it cannot be considered the type of governmental action necessary to sustain a Fifth Amendment taking claim. Accordingly, plaintiff has failed to state a claim upon which relief against the United States can be granted.

## I

Flowers Mill owns a 6.95 acre parcel in Bucks County, Pennsylvania on which it seeks to construct an 80,000 square foot, one-story office/warehouse building for sale or lease. Adjacent to plaintiff's prop-

---

1. Two additional grounds for dismissal were asserted in defendant's motion: (1) that the Claims Court lacks jurisdiction over plaintiff's substantive due process claim and (2) that plaintiff has no cause of action for violation of an executive order. Since Flowers Mill conceded in its response to the motion to dismiss that it has not alleged either a cognizable due process claim or a cause of action under Executive Order 12630, we address only the contention that plaintiff has failed to state a claim upon which relief can be granted.

erty is Buehl Field, a privately-owned utility airport. Plaintiff's proposed building would be 700 feet from the end of a runway.

Federal law requires one in plaintiff's position to notify FAA of any proposed construction or alteration of a structure in close proximity to an airport. 14 C.F.R. § 77.11(a). According to the regulations, FAA must determine whether the proposed structure will be a hazard to air navigation. The Pennsylvania Aviation Code provides that in order to lawfully construct a building within an "approach area" of an airport, the developer must first obtain a permit from the Pennsylvania Department of Transportation, Bureau of Aviation (PennDOT). 74 Pa.C.S.A. § 5701. Accordingly, Flowers Mill submitted a "Notice of Proposed Construction or Alteration" to PennDOT and to FAA pursuant to the federal regulations and to the Pennsylvania Aviation Code (PX C).

Federal aviation regulations describe civil airport imaginary surfaces which extend out and up from the end of an airport runway. 14 C.F.R. § 77.25. Safe and efficient use of airspace requires that areas under these imaginary surfaces be kept clear of obstacles. If any ground object penetrates an imaginary surface prescribed in the regulations, it may be declared a hazard to air navigation. The primary "surface" extends 200 feet beyond each end of a runway at the same elevation as the runway. 14 C.F.R. § 77.25(c). For utility airports such as Buehl Field, the approach "surface" extends outward and upward from each end of the primary surface for a horizontal distance of 5,000 feet at a slope of 20:1, *i.e.*, for each 20 feet that it extends outward from the runway end, the approach surface rises one foot above the elevation of the runway. 14 C.F.R. § 77.25(d)(2)(i). *See also* PX B.

After conducting an aeronautical study concerning the effect of plaintiff's proposal on the safe and efficient use of navigable airspace and after soliciting comments from interested parties pursuant to 14 C.F.R. § 77.35(b)(1), FAA issued a Determination of Hazard to Air Navigation. It stated that at the height and location proposed, the building would penetrate the approach surface described in the regulations (PX E). Flowers Mill appealed from this determination and was granted discretionary review to be conducted on the basis of written materials submitted pursuant to 14 C.F.R. § 77.37(c)(1).

In conjunction with the appeal, Flowers Mill submitted a runway displacement plan which would eliminate obstruction of the 20:1 approach surface by the proposed building (PX G–1). The runway displacement plan applied the guidelines set forth in the FAA Advisory Circular AC No. 150/5300–4B pertaining to utility airports such as Buehl Field. According to Appendix 9 of the Advisory Circular, displacement of a runway threshold may be required when an obstruction is beyond the airport authority's power to remove, relocate, or lower. A threshold is defined as "the beginning of that portion of the runway available and suitable for the landing of airplanes" (PX H). Generally, a runway threshold is located at the beginning of the runway pavement. A displaced threshold results when the threshold is "located at a point on the runway other than the runway end" (PX H).

Flowers Mill proposed that the Buehl Field runway be displaced by 215 feet. By doing so, its building would be 915 feet from the new threshold rather than 700 feet and would not penetrate the 20:1 approach surface. To compensate for the displacement, Flowers Mill agreed to pay for a 215 foot extension of the runway pavement on the opposite end and to grant the owner of Buehl Field an avigation easement in the airspace above its property.

This agreement was part of a settlement entered into by PennDOT and Flowers Mill after an administrative hearing held before PennDOT on November 16, 1988 (PX K). The purpose of the hearing was to resolve plaintiff's appeal of a decision by PennDOT to deny a construction permit because the proposed building would violate FAA obstruction standards. In conjunction with its appeal from PennDOT's denial of the construction permit, Flowers Mill sub-

mitted the same information regarding displacement of the runway threshold which it had submitted to FAA pursuant to its appeal of FAA's hazard determination. PennDOT agreed to grant the construction permit required by the Pennsylvania Aviation Code if Flowers Mill received a determination from FAA that the proposed building would not be a hazard to air navigation.

As part of its review process, FAA conducted an on-site evaluation of the proposal's impact on Buehl Field operations. It also reviewed the aeronautical study previously issued by FAA's eastern regional office. FAA determined that the proposed structure would require a runway threshold displacement of 500 feet in order to avoid penetrating the 20:1 approach surface set forth in 14 C.F.R. § 77.25(d)(2)(i). The regional office had found that a runway threshold displacement of only 223 feet was required to accomplish the same result. Since the 500 foot displacement would affect all aircraft landing on the runway, FAA decided that "the additional loss of landing runway is considered [to be substantially adverse] to aircraft operations" (PX M at 4). FAA decided that because the proposed structure would have a substantially adverse effect on the safe and efficient use of airspace by aircraft, it would be a hazard to air navigation and affirmed the finding of the regional office (PX M).

Final decisions issued by the FAA Administrator are appealable to the courts of appeals of the United States under 49 U.S.C.App. § 1486(a). Plaintiff filed a petition for review in the Court of Appeals for the Third Circuit on February 10, 1989 requesting reversal of FAA's hazard determination. The petition was denied on October 12, 1989; the Third Circuit found that there was substantial evidence to support the agency's conclusions. *Flowers Mill Associates v. FAA*, 888 F.2d 1379 (3d Cir.1989) (unpublished). Flowers Mill then brought this action alleging that FAA's hazard determination amounted to a regulatory taking of its property under the Fifth Amendment without just compensation.

## II

### A. *FAA Determination of Hazard to Air Navigation*

The Federal Aviation Act of 1958, 49 U.S.C.App. §§ 1301–1542, invests the FAA Administrator with broad powers to foster air safety including the power to regulate the use of navigable airspace, 49 U.S.C. App. § 1348(a) (Supp.1989), and to prescribe air traffic regulations governing the flight of aircraft for the protection of persons and property on the ground. 49 U.S.C.App. § 1348(c) (Supp.1989). In addition, the Act also addresses hazards to air safety presented by the existence of tall structures such as power lines, oil drilling derricks, antenna towers and buildings. It requires all persons to give adequate public notice of the proposed construction or alteration of any structure where notice will promote safety in air commerce. 49 U.S.C.App. § 1501 (Supp.1989); *Air Line Pilots' Ass'n Int'l v. Department of Transp., FAA*, 446 F.2d 236, 237 (5th Cir.1971).

The Act also gives the Administrator power to issue rules and regulations "as he shall deem necessary to carry out the provisions of, and to exercise and perform his powers and duties under, this chapter." 49 U.S.C.App. § 1354(a) (Supp.1989). Pursuant to this statutory authority, Part 77 of the Federal Aviation Regulations governing "Objects Affecting Navigable Airspace" was promulgated. 14 C.F.R. §§ 77.-1–77.75. These regulations are divided into six subparts, A–F. The subparts most applicable to this case are B, C and D.

Subpart B entitled "Notice of Construction or Alteration" requires each person proposing construction or alteration of a structure with a specified height and airport proximity to notify FAA of the proposal. 14 C.F.R. §§ 77.11, 77.13, 77.15. Such notification is then used by the Administrator as a basis for determining the possible hazardous effect of the proposed construction or alteration on air navigation. 14 C.F.R. § 77.11(b)(2). Subpart C entitled "Obstruction Standards" describes the standards by which an object is determined to be an obstruction to air navigation. It

contains the 20:1 slope requirement for utility airport imaginary surfaces. 14 C.F.R. § 77.23.

After FAA is notified of a proposed structure in accordance with Subpart B, it issues an acknowledgment which states that an aeronautical study of the proposed construction has resulted in one of three determinations: (1) that the proposed construction or alteration would not exceed any standard of Subpart C and would not be a hazard to air navigation, (2) that it would exceed a standard of Subpart C but would not be a hazard to air navigation or (3) that it would exceed a standard of Subpart C and further aeronautical study is necessary to determine whether it would be a hazard to air navigation. 14 C.F.R. § 77.19(c). Thus, even after a proposed structure is found to be an obstruction to air navigation, further investigation is required before it is determined that the structure is a hazard. *See Air Line Pilots' Ass'n,* 446 F.2d at 238.

Subpart D entitled "Aeronautical Studies of Effect of Proposed Construction on Navigable Airspace" provides for an aeronautical study to be conducted and contains the provisions by which the FAA Regional Director or his designee may issue a determination as to whether a proposed construction or alteration would be a hazard to air navigation. 14 C.F.R. §§ 77.33, 77.35(c). It also allows for discretionary review of the determination by the Administrator who decides whether such review will be conducted on the basis of written materials or on the basis of a public hearing. 14 C.F.R. § 77.37(a), (c). Flowers Mill obtained review under these provisions on the basis of written materials only.

■ A hazard/no-hazard determination issued by the FAA is a "final disposition," judicially reviewable under 49 U.S.C.App. § 1486(a). Jurisdiction to review these determinations lies in the federal courts of appeals. *Id.;* 49 U.S.C.App. § 1486(f). Flowers Mill appealed to the Third Circuit which, in an unpublished memorandum opinion, upheld the FAA determination that the proposed building would be a hazard to air navigation. *Flowers Mill Associates v.*

*FAA,* 888 F.2d 1379 (3d Cir.1989) (unpublished).

The issue of whether an FAA determination that a proposed structure presents a hazard to air navigation constitutes a regulatory taking is apparently one of first impression in the Claims Court and the Federal Circuit. Although the FAA regulatory process has never been reviewed here in the context of a regulatory taking claim, it has been the subject of decisions by other circuits on appeal from the final hazard/no hazard determination. *See, e.g., Aircraft Owners and Pilots Ass'n v. FAA,* 600 F.2d 965 (D.C.Cir.1979); *Air Line Pilots Ass'n Int'l v. Department of Transp., FAA,* 446 F.2d 236 (5th Cir.1971). Both of these decisions involve review of an FAA determination that a proposed structure would *not* constitute a hazard to air navigation.

In *Aircraft Owners,* the D.C. Circuit affirmed an FAA determination that proposed construction of a television antenna tower would not constitute a hazard to air navigation, finding that there was substantial evidence to support the FAA decision. The court recognized that the hazard/no hazard determination has "substantial practical impact" but explained that its primary purpose is to encourage voluntary cooperation with the regulatory framework:

> Once issued, a hazard/no-hazard determination has no enforceable legal effect. The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation. Nevertheless, the ruling has substantial practical impact.... The ruling may also affect the ability of a sponsor proposing construction to acquire insurance or to secure financing. Primarily, however, the determination promotes air safety through 'moral suasion' by encouraging the voluntary cooperation of sponsors of potentially hazardous structures.

600 F.2d at 967.

Likewise in *Air Line Pilots,* the Fifth Circuit acknowledged the practical conse-

quences of a hazard determination:[2]

> It may well be, as the FAA contends, that the only effectiveness of its determination of 'no hazard' or 'hazard' lies in the power of 'moral suasion' ascribed to the determination. But it takes little knowledge of the goings-on about us to be aware that 'moral suasion' is a considerably potent force in our society. The FAA does not deny, to be sure, that its determination of 'hazard to air navigation' either erects or removes, whichever the case may be, a practical 'stumbling block' to the construction of the proposed buildings. Thus, if the FAA had determined finally that these structures would be hazards to air navigation, it is obvious that this determination would have constituted a considerable 'stumbling block' to the proponents. For example, as a practical matter, it would unquestionably have been very difficult for the proponents of the proposed structures to secure financing or obtain insurance on a building that officially had been declared a 'hazard to air navigation.' ... To say, therefore, that the FAA's determination on the question of hazard is either practically, administratively, or legally insignificant is to ignore reality.

446 F.2d at 241.

The Fifth Circuit also recognized that "the obvious aim of requiring an administrative determination on the effect of the project is to induce in the construction of the project 'voluntary' compliance with some Congressional purpose—like safety." *Id.* at 242.

Both *Air Line Pilots* and *Aircraft Owners* are important for their explanation of the purpose of an FAA hazard/no-hazard determination, i.e., encouragement of *voluntary* compliance with the federal regulatory scheme by the proponents of potentially hazardous structures. This type of governmental action is fundamentally different from the physical destruction or intrusion on property attendant to an act of eminent domain. Consequently, it cannot be the basis for a Fifth Amendment taking claim against the government.

The FAA regulations have been examined in a takings context by a New York state court which concluded that a finding of hazard is advisory only.[3] In *Kupster Realty Corp. v. New York*, 93 Misc.2d 843, 404 N.Y.S.2d 225 (N.Y.Ct.Cl.1978) the court stated:

> While this result may appear somewhat unexpected, we believe it a proper one. First, there are no provisions in either the 1958 F.A.A. Act or the regulations thereunder authorizing or effectuating enforcement of a hazard finding against private landowners [footnote omitted]. Second, the judicially perceived Congressional intent relative to obstructions and/or hazards is that they be limited only through voluntary compliance by the private landowners affected.... A possible reason for this federal reticence [to fully preempt rights of control in the navigable airspace] is that a full federal preemption would most likely subject the federal government to the inverse condemnation suits currently brought against local airport owners, or require it to appropriate avigation easements like the ones here. Aside from the expense, such suits or appropriations would lead to what could be considered an excessive Federal involvement in matters more properly resolved by local authorities. Whatever the reason, we think the conclusion that the subject regulations did not directly restrict private landowners is

---

**2.** In *Air Line Pilots,* the Fifth Circuit vacated the FAA determination that proposed construction of high-rise apartment complexes would not be a hazard to air navigation. It remanded to the FAA, finding that its failure to send notice of discretionary review by the Administrator to the pilots' association denied them due process.

**3.** The claims arose from the appropriation of permanent easements for avigation purposes of the airspace above land owned by the claimant. The easements were taken by the State of New York for a runway clear zone required for federal funding of airport improvements. The state court held that no taking had occurred and the claims were dismissed.

consistent with evident Federal intent and policy. *Id.*, 404 N.Y.S.2d at 231.

### B. *Regulatory Takings*

The Fifth Amendment guarantees that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This guarantee is reinforced by the "safety net" of the Tucker Act, 28 U.S.C. § 1491. *Florida Rock Indus. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986). Traditionally, this constitutional guarantee prohibits the government from exercising its power of eminent domain in the name of the public good without justly compensating private landowners. The same protections have been extended into the area of inverse condemnation where no formal exercise of the power of eminent domain occurs. Inverse condemnation encompasses regulatory takings, and the Supreme Court has held that just compensation must be paid for governmental regulations which accomplish the same end as an exercise of the power of eminent domain. *English Evangelical First Lutheran Church v. Los Angeles County,* 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987).

The Fifth Amendment is not designed to limit governmental interference with property rights *per se;* it functions rather to secure compensation in the event of otherwise proper interference. *Id.* at 313, 107 S.Ct. at 2384. The well-established general rule has been that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). There is no concrete formula which delineates the precise point at which a regulation ends and a constitutional taking begins. *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). A court instead must rely on *ad hoc,* factual inquiries into the circumstances of each case. *Connolly v.*

*Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986).

■ It is clear that legitimate regulatory action does not constitute a compensable taking merely because the result may diminish the value of property or prevent its most beneficial use. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Skaw v. United States,* 740 F.2d 932, 939 (Fed.Cir.1984). Rather, the Supreme Court has articulated factors for consideration by a court when deciding whether a compensable taking has occurred. These factors include: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the governmental action. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.[4] The type of federal governmental action found to constitute a compensable taking generally involves activity which is equivalent to the physical invasion or destruction of substantial property rights. For example, action by the Army Corps of Engineers in the interest of protecting wetlands by prohibiting mining or construction on land may constitute a compensable taking if the landowner can show that there was a sufficient diminution in the fair market value of the property caused by the government's regulatory action. *See Florida Rock Indus. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), *on remand,* 21 Cl.Ct. 161 (1990); *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153 (1990).

■ Unlike the wetlands permit context, in this case, FAA's determination that plaintiff's proposed construction in close proximity to an airport was a hazard to air navigation did not deprive the plaintiff of any property rights. FAA's hazard finding was advisory only and not legally enforceable. A landowner is not required to ob-

---

**4.** The Supreme Court considered an additional factor when it was determining whether the mere enactment of a zoning ordinance constituted a taking. *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). In *Agins,* the Court also considered whether the ordinance substantially advanced legitimate state interests. *Id.* at 260, 100 S.Ct. at 2141.

tain a permit from FAA before proceeding with development, and FAA has no power to prevent construction.[5] Even assuming that the economic impact of the aviation regulations on Flowers Mill would be great and that it would interfere with their distinct, investment-backed expectations, the FAA action cannot be the basis of a Fifth Amendment taking because of the voluntary nature of the regulatory scheme. *Aircraft Owners and Pilots Ass'n v. FAA*, 600 F.2d 965 (D.C.Cir.1979); *Air Line Pilots Ass'n Int'l v. Department of Transp., FAA*, 446 F.2d 236 (5th Cir.1971).

Flowers Mill concedes that FAA's determination is technically only advisory and that no permit from FAA is required.[6] *See* Pltf.'s Answer to Def.'s Motion to Dismiss, p. 11. It nonetheless argues that the practical effect of the hazard determination constitutes a taking since plaintiff was unable to obtain the necessary financing and insurance to commence construction. There simply is no legal authority to support this position. Plaintiff's reliance on *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed.Cir.1983) for the proposition that the practical effect of an FAA hazard determination is sufficient federal action on which to base a Fifth Amendment taking claim is attenuated.

*Yuba Goldfields* is factually distinguishable from the situation presented by Flowers Mill. It involved a suit by a mining company for a temporary taking of its mineral interest on land in which the United States owned the underlying fee. Yuba Goldfields, Inc. had mined the area continuously since 1905 when in 1975 the Army Corps of Engineers attempted to enforce the government's ownership of the precious metals by prohibiting Yuba from dredging or removing any material from the land. Subsequently, Yuba successfully confirmed its title to the mineral interest in a district court action and the Federal Circuit found that a temporary taking had occurred. *Yuba Goldfields*, 723 F.2d at 884, *on remand, Yuba Natural Resources, Inc. v. United States*, 10 Cl.Ct. 486 (1986), *rev'd*, 821 F.2d 638 (Fed.Cir.1987). *Yuba Goldfields* stands for the general proposition that in Fifth Amendment just compensation analysis, the focus is on what the government did, not what it said it was doing, or what it later says its intent was. The case does not support plaintiff's proposition here that a Fifth Amendment taking results from the practical effect of an FAA hazard determination when that determination is not legally enforceable and is issued by an agency with no power to prohibit or limit proposed construction. The United States government did nothing which deprived plaintiff of a property right in this case.

### C. Defendant's Motion to Dismiss

For purposes of ruling on defendant's motion to dismiss, the factual allegations contained in the complaint must be taken as true and the court must consider them in a light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The inquiry is whether Flowers Mill is entitled to offer evidence in support of facts alleged in the complaint, not whether it will ultimately prevail on the merits. A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that plaintiff can prove no set of facts entitling him to relief. *Id.; W.R. Cooper Gen. Contractors, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988).

In this case, it is clear from the pleadings that Flowers Mill would be unable to prove any set of facts entitling it to relief even though there are practical consequences resulting from FAA's hazard determination which present obstacles to plaintiff's development plans. Even assuming that Flowers Mill has been damaged by inability to

---

5. FAA's hazard determination does impact on the ability to obtain a construction permit from the Federal Communications Commission but only with regard to "signal-generating" or "signal-producing" facilities, not buildings. *See Illinois Citizens Committee for Broadcasting v. FCC*, 467 F.2d 1397 (7th Cir.1972); *Chronicle Publishing Co. v. FCC*, 366 F.2d 632 (D.C.Cir.1966).

6. Prior to this action, Flowers Mill entered into a settlement agreement with PennDOT from whom it was required by state law to obtain a construction permit. This agreement conditions state approval of the permit on obtaining a no-hazard determination from FAA. It does not, however, change the nature of the *federal* regulatory activity which fails to deprive the landowner of any property rights.

develop its property in the manner intended because third parties relied on FAA's determination, FAA still has not acted in any way to interfere with plaintiff's property rights. If Flowers Mill successfully obtained the necessary financing, insurance, and state permits, FAA would be powerless to prevent construction of the proposed building. It is concluded that plaintiff has failed to state a taking claim upon which relief against the United States can be granted.

### III

Defendant's Motion to Dismiss filed on May 22, 1989 is GRANTED. Judgment shall be entered dismissing the complaint for failure to state a claim upon which relief can be granted.

Pursuant to RUSCC 54(d), costs shall be allowed to the defendant ("the prevailing party").