12 F.3d 213
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MICHIGAN CHROME AND CHEMICAL COMPANY, Plaintiff-Appellant,
v.
CITY OF DETROIT, Defendant-Appellee.
 Nos. 92-1694, 92-1916.
 United States Court of Appeals, Sixth Circuit.
 Oct. 26, 1993.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, No. 92-71015; Gilmore, Judge
 E.D.Mich.
 AFFIRMED IN PART, DISMISSED IN PART.
 Before: MILBURN, RYAN, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Michigan Chrome and Chemical Company ("Michigan Chrome") appeals the district court's orders dismissing its complaint, which alleged an unconstitutional taking of its property by the City of Detroit ("the City"), and also the denial of its motion for a preliminary injunction. Plaintiff also challenges the district court's order imposing sanctions under Rule 11 of the Federal Rules of Civil Procedure. On appeal, the issues presented are (1) whether Michigan Chrome should be required to exhaust its administrative remedies in connection with its inverse condemnation claim, which alleges an unconstitutional taking of its property, against the City of Detroit; (2) whether the doctrine of futility excuses Michigan Chrome from the requirement of exhaustion of administrative remedies in connection with its inverse condemnation claim; and (3) whether the district court erred in imposing Rule 11 sanctions against plaintiff after the dismissal of its second complaint. For the reasons that follow, we affirm the district court's judgment dismissing Michigan Chrome's action alleging an unconstitutional taking of its property by the City of Detroit, and we dismiss Michigan Chrome's appeal of the district court's imposition of Rule 11 sanctions on the grounds that the order imposing sanctions is not a final appeal able order.
 
 I.
 A.
 
 2
 Since 1945 or 1946, Michigan Chrome has owned and operated a business at 8615 Grinnell in Detroit, Michigan. Since 1946, Michigan Chrome's business has expanded from one building to approximately three buildings. In operating its business, Michigan Chrome applies various chemical processes and coatings to metal products in order to protect those products from rust and corrosion. Further, as part of its business, it is necessary for Michigan Chrome to store large amounts of chemicals inside its facilities.
 
 
 3
 The City owns, and operates for profit, Detroit Cty Airport ("Airport"), which is located adjacent to Michigan Chrome's property. The wetern-most edge of the east/west runway of the Detroit City Airport, Runway 7/25 (also known as Runway 7-25, Runway 7 and Runway 25) is within 375 feet of Michigan Chrome's facilities. Moreover, although Michigan Chrome's facilities are outside the Airport, the facilities are within the Runway Protection Zone ("RPZ"), formerly known as the clear zone, of Runway 7. It is the proximity of Michigan Chrome's facilities to the Airport runway which resulted in the initiation of this action.
 
 
 4
 The City is a home rule municipality under Michigan law and it operates under a home rule charter. Article 7 of the City Charter established a Building and Safety Engineering Department ("BSE") which administers land use within the city's boundaries including applications for permits, grants, variances, waivers, and exceptions of any kind under zoning laws, ordinances, and regulations. The BSE is part of the executive branch of City government. The Charter also provides for a Zoning Board of Appeals ("ZBA") which hears appeals from the BSE. Under state law, the ZBA is part of the legislative branch of the City government. Furthermore, persons aggrieved by decisions of the ZBA may, after exhausting the remedies provided by the Board, appeal the ZBA's decision to the County Circuit Court. See Mich.Comp.Laws Sec. 259.460.
 
 
 5
 The City's Airport Zoning Regulations require a permit for new construction or substantial modifications to an existing structure. The permit must be sought from the BSE. Although the Airport Zoning Regulations provide that no permit shall be granted which would allow or create an airport hazard or allow or create a greater airport hazard, Michigan law allows variances from this standard. Mich.Comp.Laws Sec. 259.453.
 
 
 6
 City Ordinance Sec. 48.0000, et seq., provides that adverse decisions of the BSE for proposed construction over 35 feet in height shall be referred to the ZBA. The ordinance also requires the ZBA to notify the Federal Aviation Administration ("FAA") and to give due deference to the comments of that agency concerning proposed construction. However, in deciding to grant or deny a variance, the ZBA is not bound by the FAA's opinion.
 
 
 7
 The Detroit City Airport is located on 250 acres of land on the east side of the City and began operation as a general aviation airport in 1930. The Airport has two runways, a north/south runway--Runway 15/33--and an east/west runway--Runway 7/25. The Airport's Certificate of Operation was upgraded in 1987 following the introduction of commercial aircraft for passenger service. This change was part of the Detroit City Airport Master Plan Update, which extended Runway 15/33 from 5090 feet in length to 5211 feet in length. As part of the master plan, Runway 15/33 is the primary runway and serves commercial and general aviation aircraft. Runway 7/25 is the secondary runway and is used only for general aviation. The Master Plan Update did not involve an enlargement of the original borders of the airport.
 
 
 8
 In addition, the Airport operates with an approved Airport Layout Plan ("ALP") which was adopted by the Detroit City Council and approved by the FAA. The present ALP was approved on June 1, 1988. The ALP permits the City to operate the Airport with "design standard waivers" from the Runway Protection Zone ("RPZ") configuration set forth under federal regulations. See 14 C.F.R. Part 77.
 
 
 9
 The standard configuration for airports provides for an RPZ, which is an area located at each end of a runway, in order to provide unencumbered airspace for aircraft to take off and land. The RPZ projects out from the end of the runway at a 20:1 height to space ratio. Where development is present around an airport, the airport must provide for the necessary height to space ratio by shortening the useable runway or by the use of a displacement of the runway threshold from the end of the runway pavement. The ALP for the Detroit City Airport includes design standard waivers for both runways. Specifically, concerning this case, Runway 7 operates with a 736 foot displaced threshold, and Runway 25 operates with a 730 foot displaced threshold.[1]
 
 
 10
 The City applied for and received funds from the federal government under the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. Sec. 2201, et seq., to make improvements on Runway 7/25 and to eliminate some of the design standard waivers for Runway 15/33. The grants from the federal government were conditioned on certain assurances set forth by the City in agreements executed in 1989, 1990, and 1991. Further, as required by the AAIA, the City has proposed a new Master Plan which involves expanding the original boundaries of the airport. Specifically, the plan calls for construction of a new 7200 foot north/south runway. The City Council approved the new Master Plan on July 13, 1990, and submitted it to the FAA. Following comments by the FAA, the Master Plan is being revised by the City; however, it was not approved by the FAA at the time of the filing of this appeal. The proposed Master Plan contemplates acquisition of Michigan Chrome's property as well as other properties which are within the RPZ of Runway 7/25.
 
 
 11
 The problem giving rise to this action arose when Michigan Chrome developed plans to expand its current metal plating facility in order to allow Michigan Chrome to utilize a new process for metal plating which it had developed. In order to apply the plating process, Michigan Chrome alleges that it must construct a new facility; however, it also alleges that the new plating process requires wastewater treatment, warehousing capacity, and other materials which are already present at its current facility. Michigan Chrome asserts that due to prohibitive costs, it cannot afford to construct the new facility to house its newly developed plating process anywhere other than its current location.
 
 
 12
 As part of the construction of its new facility, Michigan Chrome sought to construct a 21 foot smokestack atop one of its buildings which is 39 feet high. This would result in a 60 foot high structure which would be within the RPZ of runway 7/25. On April 29, 1991, Michigan Chrome filed a Notice of Proposed Alteration with the FAA for such an addition to its building. Based upon an aeronautical study, the FAA issued a Hazard Determination for the proposed construction in which it determined that the facility would constitute an obstruction to aerial navigation. FAA regulations also provide that an obstruction to aerial navigation is also presumed to be a hazard to aerial navigation.
 
 
 13
 Further, Michigan Chrome's property is in an area zoned M-2. Buildings in an M-2 zone are subject to a 40 foot height limitation. The M-2 zoning limitation occurs throughout the City of Detroit and is unrelated to the proximity of the airport. Michigan Chrome did not apply to the BSE for a permit for the new construction, nor did it seek a variance from the ZBA for the M-2 zoning designation of its property. Rather, Michigan Chrome sued the City alleging that the City inversely condemned its property because the encumbrance created and maintained by the City of Detroit for the operation of the airport rendered its property unsalable and unleasable. Michigan Chrome also claimed that the encumbrances are unduly restrictive and denied it any economically viable use of its property. Michigan Chrome further asserts that the new Master Plan for the airport which contemplates acquisition of its property has rendered its property unsalable and unleasable due to the uncertainty concerning the future of the property.
 
 B.
 
 14
 On August 17, 1990, Michigan Chrome filed an action in the Circuit Court of Wayne County, Michigan, alleging that the City had acted to inversely condemn its property. On September 17, 1990, the City removed the case to the United States District Court for the Eastern District of Michigan under 28 U.S.C. Secs. 1331 and 1441.
 
 
 15
 Subsequently, the City filed a motion to dismiss Michigan Chrome's complaint under Federal Rule of Civil Procedure 12(b)(6). At a hearing on the motion to dismiss held on November 8, 1990, the district court dismissed Michigan Chrome's complaint without prejudice, finding that Michigan Chrome's claims were not ripe for adjudication.
 
 
 16
 On February 26, 1992, Michigan Chrome filed a second action in the district court, alleging that its claims against the City were now ripe for review due to the discovery of certain evidence and the occurrence of certain events. Along with its complaint, Michigan Chrome also filed a motion for a preliminary injunction, requesting that the court order the City to cease operations on Runway 7-25 until such time as the City complies with the FAA regulations concerning clear zones or runway protection zones. Thereafter, the City filed a motion to dismiss Michigan Chrome's second action.
 
 
 17
 At a hearing on May 6, 1992, the district court again determined that Michigan Chrome's complaint should be dismissed without prejudice, finding that its claim was not ripe for review. This ruling was announced in open court. On May 19, 1992, Michigan Chrome filed a notice of appeal of the district court's order; however, the district court's order was not entered until July 20, 1992.[2] Thereafter, the City filed a motion seeking sanctions under Fed.R.Civ.P. 11 and 28 U.S.C. Sec. 1927. Following a hearing on July 2, 1992, the district court imposed Rule 11 sanctions against Michigan Chrome on the grounds that Michigan Chrome's complaint and the relief sought were "not the result of reasonable inquiry into the factual and legal bases of the claims...." J.A. 351. A timely notice of appeal was also filed to the court's order of July 2, 1992.
 
 II.
 
 18
 Michigan Chrome argues that the district court erred in dismissing its claim against the City on the grounds that its claim was not ripe for adjudication. Specifically, Michigan Chrome argues that the City operates the Airport in violation of the FAA's regulations concerning clear zones or RPZ. Michigan Chrome further argues that the City's operation of the Airport in such a manner has deprived its property of all economically viable uses, particularly the sale or lease of the property, because the property, or at least a portion of it, is within the RPZ of runway 7/25. Therefore, according to Michigan Chrome, it should be absolved from exhausting its administrative remedies.
 
 A.
 
 19
 "Whether a district court correctly dismissed ... claims pursuant to Fed.R.Civ.P. 12(b)(6) is a question of law subject to de novo review." G.M. Engineers and Assoc., Inc. v. West Bloomfield Township, 922 F.2d 328, 330 (6th Cir.1990) (quoting Dugan v. Brooks, 818 F.2d 513, 516 (6th Cir.1987)). This court will accept a plaintiff's factual allegations as true and determine whether any set of facts consistent with a plaintiff's allegations entitles plaintiff to relief. Id.
 
 B.
 
 20
 Although Michigan Chrome argues that it is absolved from exhausting its administrative remedies because the City operates the Airport in violation of FAA regulations, Michigan Chrome has failed to take the steps necessary to establish that the City of Detroit operates the Airport in violation of FAA regulations. The Federal Aviation Act, 49 U.S.C. app. Sec. 1301, et seq., places responsibility for determining compliance and enforcing federal aviation law with the Secretary of Transportation ("Secretary"). The Secretary has the sole responsibility for developing and enforcing rules for the safe and efficient use of navigable airspace. 49 U.S.C. app. Secs. 1348(a) and 1354(a). The Secretary may grant exemptions from the requirements of rules governing navigable airspace where it is in the public interest. 49 U.S.C. app. Sec. 1348(e); 14 C.F.R. Secs. 11.25, 139.111(a), 151.99 and 152.5(a).
 
 
 21
 In the situation involved in this case, the Secretary approved the operation of runway 7/25 at the Airport with a displaced threshold at both ends of the runway. See 14 C.F.R. Sec. 151.5(a)(3). Structures within the RPZ which otherwise would be considered obstructions are "waived" due to the displaced thresholds. Further, contrary to Michigan Chrome's arguments, the regulations do permit the Secretary to approve deviations, like displaced thresholds, from standard runway configurations. 14 C.F.R. Sec. 151.11(d).
 
 
 22
 Michigan Chrome's allegations that the Airport operates in violation of the clear zone regulations could only be sustained in the event a court finds that the Secretary's approval of the displaced thresholds on runway 7/25 was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 194 (7th Cir.), cert. denied, 479 U.S. 847 (1986); City of Houston v. F.A.A., 679 F.2d 1184, 1190 (5th Cir.1982). However, Michigan Chrome has never petitioned the FAA or any court for such a finding concerning the displaced thresholds on runway 7/25. Thus, there is no basis in the record to support Michigan Chrome's assertion that the City operates the Airport in violation of FAA clear zone regulations.
 
 
 23
 Moreover, the cases cited by Michigan Chrome for the proposition that the Airport is operated in an unconstitutional manner are distinguishable from the situation in this case. In Griggs v. Allegheny County, 369 U.S. 84 (1962), the plaintiffs owned land and a residence adjacent to the northeast runway of the Greater Pittsburgh Airport. Id. at 87, 82 S.Ct. at 532. Planes taking off from the northeast runway regularly flew over plaintiffs' residence at heights ranging from 30 to 300 feet. On landing, the planes flew at heights ranging from 53 to 153 feet. On takeoff, the noise of the planes created a noise level in the residence comparable "to the noise of a riveting machine or steam hammer," and on landings the noise level was similar "to that of a noisy factory." Id. The "low altitude flights over plaintiffs' property caus[ed] ... their removal therefrom as undesirable and unbearable for their residential use." Id. The Supreme Court concluded that the operation of the airport in such a manner resulted in the "taking" of an air easement over plaintiffs' property for which they were entitled to just compensation. Id. at 88, 82 S.Ct. at 533.
 
 
 24
 In Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), the Supreme Court found a "taking" without just compensation where New York law required the property owner to permit a cable television company to install cable facilities on the roof and on one side of her apartment building. Id. at 421, 102 S.Ct. at 3168. However, the Supreme Court's holding that there was a "taking" in Loretto was a "very narrow" holding which "affirmed and applied 'the traditional rule that a permanent physical occupation of property is a taking.' " Calvert Investments, Inc. v. Louisville and Jefferson County Metro. Sewer Dist., 847 F.2d 304, 308-09 (6th Cir.1988).
 
 
 25
 However, in this case, the City has not operated the Airport in such a way as to produce either a permanent physical occupation of Michigan Chrome's property, nor has it operated the Airport in such a way as to drive Michigan Chrome off its property. Michigan Chrome continues to use its property and to operate its business there, just as it has since 1945 or 1946. Moreover, not only is Michigan Chrome's business ongoing, its claim before this court is based upon its desire to erect an expansion of its business facilities on its property.
 
 
 26
 Furthermore, to the extent that Michigan Chrome asserts that the City has taken its property by physical invasion, namely, by permitting aircraft to fly through the airspace above its property, this claim must also fail. The concept of the taking by physical invasion is one that has been recognized by numerous state and federal courts. See e.g., Indiana Toll Road Comm'n v. Jankovich, 193 N.E.2d 237, 239 (Ind.1963), cert. dismissed, 379 U.S. 487 (1983). However, in this case, Michigan Chrome's claim of taking by physical invasion must fail because: (1) the City airport was in operation long before Michigan Chrome occupied the land adjacent to runway 7/25; (2) the City has gained a prescriptive easement through the regular use of the airspace over Michigan Chrome's property during the more than 50 years it has operated the airport, see Cook v. Grand River Hydroelectric Power Co., Inc., 346 N.W.2d 881 (Mich.App.1984); and (3) before Michigan Chrome can pursue a federal action under the takings clause, it must pursue available state remedies, including an action for the allegedly unconstitutional taking, see Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194-97 (1985); G.M. Engineers and Associates, Inc., v. West Bloomfield Twp., 922 F.2d 321, 328 (6th Cir.1990), an action which Michigan Chrome has never taken.
 
 C.
 
 27
 Michigan Chrome also argues that the City's operation of the Airport has deprived it of any and all economically viable uses of its land. A regulatory scheme effects a taking if the regulations do not substantially advance legitimate state interests or deny an owner economically viable use of his land. Agins v. City of Tiburon, 447 U.S. 255 (1980). See also Keystone Bituminous Coal Ass'n v. De Benedictis, 480 U.S. 470, 484 (1987). Here, the City has made no change to the regulatory scheme applicable to Michigan Chrome's land. Thus, Michigan Chrome has not been deprived of every economically viable use of its land, since it continues to operate its plating business on its property.
 
 
 28
 Moreover, when a plaintiff alleges that a regulatory scheme has taken his property, the plaintiff must establish two things--one, that the regulations go too far and result in a taking of his property, and, two, that any proffered compensation is not just. MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 348 (1986). "[A]n essential prerequisite to [a regulatory taking claim] is a final and authoritative determination of the type and intensity of development legally permitted on the subject property." Id. "Until a property owner has 'obtained a final decision regarding the application of the zoning ordinance ... to its property, it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed.' " Id. at 349, 106 S.Ct. at 2566 (quoting Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186, 190 n. 11 (1985)). A court cannot determine if a regulatory scheme goes too far until it knows how far the regulations go. Yolo County, 477 U.S. at 348. Therefore, because Michigan Chrome has never sought a construction permit from the BSE or a variance from the ZBA, its claim of a regulatory taking is not ripe for review.
 
 D.
 
 29
 Michigan Chrome argues that the district court erred in finding that its claim is not ripe for adjudication based upon the FAA's finding that its proposed expansion would be an obstruction to aerial navigation. However, the FAA's finding that Michigan Chrome's proposed expansion would be an obstruction to aerial navigation is not the equivalent of final administrative action by the City with regard to Michigan Chrome's proposed expansion. The hazard/no hazard determination by the FAA has a substantial practical impact, but its primary purpose is to encourage voluntary cooperation with the regulatory framework established by the FAA. A hazard/no hazard determination is not legally enforceable; the FAA has no power to prohibit or limit proposed construction which is believed to be hazardous to air navigation. Rather, the hazard/no hazard determination promotes voluntary compliance with air safety standards through "moral sausion," because such a ruling does affect the ability of the person proposing construction to secure financing or obtain insurance. Flowers Mills Assoc. v. United States, 23 Cl.Ct. 182, 188-89 (1991) (citing Aircraft Owners and Pilots Ass'n v. F.A.A., 600 F.2d 965, 967 (D.C.Cir.1979)). Moreover, in this case, Michigan Chrome has failed to obtain a final administrative decision from the City regarding the proposed expansion of its facility, and Michigan Chrome has never sought a permit from the BSE to construct its proposed expansion.
 
 
 30
 "A claim that a government regulation constitutes a taking of property in violation of the fifth amendment will not be ripe for adjudication 'until the government entity charged with implementing the regulations has reached a decision regarding the application of the regulations to the property at issue.' " Seguin v. City of Sterling Heights, 968 F.2d 584, 587 (6th Cir.1982) (quoting Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985)). Finality in the Fifth Amendment takings context has two distinct concepts--first, a zoning determination is not deemed final until the plaintiffs have applied for and been denied a variance, and, second, where the state provides an adequate procedure for seeking just compensation, the property owner must use the procedure and be denied just compensation before he can claim a Just Compensation Clause violation. Sequin, 968 F.2d at 587. See also United States v. Confederate Acres Sanitary Sewage and Drainage System, Inc., 935 F.2d 796, 800 (6th Cir.1991).
 
 
 31
 Michigan provides just such a remedy. "[U]nder Michigan law a 'taking' of private property for public use is not restricted to cases involving absolute conversion of private property, but also includes cases where the value of the property is destroyed by the action of the government or where the owner is excluded from the use or enjoyment of his property...." Bigelow v. Michigan Dep't of Natural Resources, 970 F.2d 154, 158 (6th Cir.1992) (quoting Blue Water Isles Co. v. Department of Natural Resources, 431 N.W.2d 53, 58 (Mich.1988)). "Since [the plaintiff] has not attempted to use Michigan's inverse condemnation procedure or establish the inadequacy of the procedure in these circumstances, his claim of taking without just compensation, if that is indeed his claim, is not ripe and cannot be considered by this court." Bigelow, 970 F.2d at 158 (quoting Macene v. MJW, Inc., 951 F.2d 700, 704 (6th Cir.1991)).
 
 
 32
 Moreover, although Michigan Chrome argues throughout its brief that it should not be required to exhaust its administrative remedies, "finality, not the requirement of exhaustion of remedies, is the appropriate determinant of when litigation may begin. By finality we mean that the actions of the city were such that further administrative action by [the plaintiff] would not be productive." Bannum, Inc. v. City of Louisville, Ky., 958 F.2d 1354, 1362 (6th Cir.1992). The lone applicable exception in the context of an allegation of the taking of property without just compensation is where the application for a variance of a zoning regulation would be futile and idle act. Id. (citing Martino v. Santa Clara Valley Water Dist., 703 F.2d 1141, 1146 n. 2 (9th Cir.), cert. denied, 464 U.S. 847 (1983)). "For the exception to be available to an aggrieved landowner, the landowner must have submitted at least one 'meaningful application' for a variance from a challenged zoning regulation." Id.[3]
 
 
 33
 Here, the City has taken no final action with regard to Michigan Chrome's planned expansion because Michigan Chrome has not submitted any meaningful applications to the BSE, or the ZBA, concerning the planned expansion. Moreover, as previously discussed, the FAA's finding that Michigan Chrome's proposed expansion would be an obstruction to aerial navigation is not the equivalent of final administrative action by the City with regard to Michigan Chrome's proposed expansion. Federal law requires persons who own land adjacent to an airport to notify the FAA of any proposed construction or alterations of structures in close proximity to an airport, and according to the regulations, the FAA must determine whether the proposed structure will be a hazard to air navigation. 14 C.F.R. Sec. 77.11(a); Flowers Mills Assoc. v. United States, 23 Cl.Ct. 182 (1991). The hazard/no hazard determination by the FAA encourages voluntary cooperation with the regulatory framework and is legally unenforceable. Id. at 188-89.
 
 
 34
 The action of the FAA is encouraging voluntary compliance with the federal regulatory scheme differs fundamentally from the physical destruction or intrusion on property involved in claims of eminent domain. Flowers Mills, 23 Cl.Ct. at 186. Moreover, a landowner is not required to obtain a permit from the FAA before undertaking potentially hazardous construction. Id. at 188. See also Condor Corp. v. City of St. Paul, 912 F.2d 215, 219 (8th Cir.1990) (there is no conflict between a city's regulatory power over land use and the federal regulation of airspace, since the FAA does not preempt local zoning authority). See also Greater Orlando Aviation Auth. v. F.A.A., 939 F.2d 954, 959 (11th Cir.1991) ("The local zoning board ... has no authority to affect the FAA's determination. Further, the local remedies involve an area of the law over which the FAA does not have jurisdiction, namely, local zoning."). Thus, because of the voluntary nature of its regulatory scheme, the FAA's finding that Michigan Chrome's proposed expansion would be an obstruction to aerial navigation cannot be the basis of a takings claim under the Fifth Amendment.
 
 
 35
 Furthermore, contrary to Michigan Chrome's argument, the announcement by the City of its new Master Plan for the Airport, which would involve the acquisition of Michigan Chrome's property, is not a "taking" under the Fifth Amendment. Michigan Chrome asserts that the City's public announcement of the new Master Plan is a "taking" because the potential acquisition of its property by the City has rendered the property both unsalable and unleasable.
 
 
 36
 In Allen Family Corp. v. City of Kansas City, 525 F.Supp. 38 (W.D.Mo.1981), Kansas City publicly disseminated proposed plans to construct a City Park in an area which included plaintiff's property, the Allen family farm. Although the plaintiff conceded that there had been no physical invasion of its land, it asserted that the City had in effect inversely condemned its land because the reports and publicity associated with the proposed development of the City Park had made it impossible for the plaintiff to sell the land or receive even a reasonably fair bid for the property. Id. at 39. The district court rejected the plaintiff's claim of inverse condemnation, noting that the planning activities of a City further an important governmental goal of encouraging orderly growth within a metropolitan area. The court further stated that if a City could not generate preliminary ideas for future development and obtain public reaction to its preliminary plans, disastrous results could ensue. Id. at 40. Further, the court stated:
 
 
 37
 To force a city to fully condemn and pay for any properties which were mentioned in a preliminary plan would circumvent the whole planning phase of governmental decision-making and would lock the city into a specific plan which might not have significant public support.
 
 
 38
 Id. at 40. Finally, the district court noted that neither the prior existing use of the Allen family farm nor the agricultural capability of the land had been impaired by the dissemination of the City's plans for the proposed park. Id. at 41.
 
 
 39
 In the absence of extraordinary delay, fluctuations in property values during the governmental decision-making process are "incidents of ownership" rather than an unconstitutional "taking" of the property. See Agins v. City of Tiburon, 447 U.S. 255 (1980). "The extraordinary delay exception is used to determine the amount of compensation the landowner should receive if the value of the affected property decreases during the pendency of the condemnation proceedings. Its purpose is to prevent the government from instituting actual condemnation proceedings and then put the proceedings on hold, thus driving down the land's value and allowing the governmental entity to finally purchase the land at a drastically reduced price when condemnation is completed." Allen Family, 525 F.Supp. at 40. See also Barsky v. City of Wilmington, 578 F.Supp. 170, 173 (D.Del.1983) ("Absent delay or other unreasonable conduct amounting to an abuse of eminent domain authority, 'economic loss caused by [a city's urban renewal plan] does not constitute a taking within the meaning of the fifth and fourteenth amendments.' ").
 
 
 40
 In Foster v. City of Detroit, 254 F.Supp. 655 (E.D.Mich.1966), aff'd, 405 F.2d 138 (6th Cir.1969), the district court concluded that a de facto taking occurred when the City commenced condemnation proceeding and kept its lis pendens in effect for five years after the renewal project ceased. The City then abandoned the condemnation proceedings after ten years and began new condemnation proceedings. The district court found a taking based upon the unreasonable delay in the condemnation proceedings because the City abandoned its condemnation proceedings in order to institute new proceedings based upon the lower property values in the blighted area slated for renewal. Moreover, there was evidence that the City encouraged and aggravated the deterioration of property and property values within the condemned area. Id. at 662. The purpose of the district court's application of the unreasonable delay exception was to give full compensation to the property owners based upon the City's precondemnation delays. Id.
 
 
 41
 In this case, there has been no unreasonable delay on the part of the City. The City approved the new Master Plan for the Airport under the AAIA in July 1990. The Master Plan was forwarded to the FAA which did not approve the plan, but rather returned it with comments to the City for revision. Thus, any delay in acquiring Michigan Chrome's property pursuant to the new Master Plan is attributable to the FAA not the City.
 
 
 42
 Moreover, as part of the FAA's approval of the City's new Master Plan for the Airport, the City would receive federal funds from the agency to acquire Michigan Chrome's property and clear the displaced waiver on runway 7/25. To require the City to condemn and acquire Michigan Chrome's property now would "lock" the City into the new Master Plan before it received FAA approval and the accompanying federal funds. Moreover, Michigan Chrome continues to operate an ongoing business on its property adjacent to the Airport, as it has for nearly fifty years. The City has also taken no action to block Michigan Chrome's proposed expansion of its facility. Indeed, as discussed above, Michigan Chrome has not even sought a permit from the City to build the proposed expansion. Thus, there is no evidence that the City has acted to cause, or to aggravate, a diminution of the value of Michigan Chrome's property. Thus, the City's announcement of its new Master Plan for the Airport, which includes the acquisition of Michigan Chrome's property, does not constitute a taking under the Fifth Amendment.
 
 E.
 
 43
 Michigan Chrome argues that it should be excused from submitting construction plans for its proposed expansion to the BSE, and/or the ZBA, because doing so would be futile. In arguing that the City would not grant a construction permit for its proposed expansion, Michigan Chrome points to a "recently executed grant agreement" between the City and the FAA. In exchange for federal grant moneys for the Airport, the City agreed in relevant part:
 
 
 44
 The Sponsor [City] agrees to take the following actions to maintain and/or acquire a property interest, satisfactory to the FAA, in the Runway Protection Zones:
 
 
 45
 a. Existing Fee Title Interest in the Runway Protection Zone.
 
 
 46
 The Sponsor agrees to prevent the erection or the creation of any structure or place of public assembly in the Runway Protection Zone, as depicted on the Exhibit "A" Property map, except for navaids that are fixed by their functional purposes or any other structure approved by the FAA. Any existing structures or uses within the Runway Protection Zone will be cleared or discontinued unless approved by the FAA.
 
 
 47
 b. Existing Easement Interest in the Runway Protection Zone.
 
 
 48
 The Sponsor agrees to take any and all steps necessary to insure that the owner of the land within the designated Runway Protection Zone will not build any structure in the Runway Protection Zone that is a hazard to air navigation, or which might create glare or misleading lights or lead to the construction of residences, fuel handling and storage facilities, smoke generating activities, or places of public assembly, such as churches, schools, office buildings, shopping centers, and stadiums.
 
 
 49
 c. Future Interest in the Runway Protection Zone.
 
 
 50
 The Sponsor agrees that by December 30, 1993, it will acquire fee title or easement interest in the Runway Protection Zones for Runways 7, 25, and 33 that presently are not under their control. Said interest shall provide the protection noted in above Subparagraphs (a) and (b).
 
 
 51
 Appellant's Brief on appeal from the granting of the motion to dismiss, p. 34. As earlier noted, for the futility exception to be available to an aggrieved landowner, the landowner must have submitted at least one "meaningful application" for a variance from challenged zoning regulations. Bannum, 958 F.2d at 1362. As also noted earlier, Michigan Chrome has not submitted any meaningful application for a construction permit to the BSE. The City correctly points out in its brief on appeal that because Michigan Chrome has neither submitted a development plan to the City for its proposed expansion nor applied for variances from the existing M-2 zoning regulations, the City "can only speculate on what or if Michigan Chrome intends to construct on its property." Appellee's Brief, p. 37.
 
 
 52
 Moreover, it also appears from the record that any conclusion as to what action the City might take if actually presented with applications for a construction permit and/or variances by Michigan Chrome would be purely speculative on the part of this court. Interestingly, the following colloquy took place between the district judge and counsel for the City at the hearing on the motion to dismiss Michigan Chrome's second action:
 
 
 53
 I want to point out to the Court one factual item that I believe is most important in this case. Michigan Chrome sits on nine acres of property which is outside of the airport. It says it has a 150,000 square foot building. When it provided the coordinants [sic] to the FAA, the coordinants which it provided was upon property that was the closest that they could get to the airport even though they had existing property upon which they could have put the building which would put them outside of the clear zone [RPZ] whether or not you took into account the displaced threshold.
 
 
 54
 THE COURT: You say they have sufficient property to expand outside the clear zone, is that what you are saying?
 
 
 55
 [COUNSEL]: Yes, on the other side of where the clear zone [RPZ] would in fact end even with or without the displaced threshold. Given that, if we were before the Zoning Board of Appeals, I do believe that [Michigan Chrome] would have to give some explanation of why he [sic] could not put his building in a place that would not interfere with the airport and the zoning laws.
 
 
 56
 J.A. 333-34.
 
 
 57
 Thus, contrary to Michigan Chrome's argument, it is by no means certain that the City would have to deny its proposed expansion in order to comply with its grant agreement with the FAA. Rather, on the basis of the exchange between the district judge and counsel, it would appear possible that the City could grant Michigan Chrome a construction permit for the proposed expansion and still be in compliance with the terms of the grant agreement. Moreover, since Michigan Chrome has never given the City the opportunity to decide what it will do, any conclusion on our part would be purely conjectural. However, assuming arguendo that we would wish to speculate on what the City would do, we note that since Michigan Chrome represents manufacturing jobs within the City of Detroit, it seems entirely logical to assume that the City would make every effort to accommodate both Michigan Chrome's desire to expand and its grant agreement with the FAA because both represent a source of revenue for the City. Therefore, the futility exception to the finality requirement should not be applied to excuse Michigan Chrome from seeking a construction permit and variance from the BSE and ZBA.
 
 F.
 
 58
 Finally, Michigan Chrome challenges the district court's imposition of Rule 11 sanctions. Michigan Chrome argues that it should not have been sanctioned as a result of the filing of its second action.
 
 
 59
 The test in this circuit for the imposition of sanctions under Rule 11 is whether the conduct of the individual attorney was reasonable under the circumstances. Mann v. G & G Mfg. Inc., 900 F.2d 953, 957 (6th Cir.), cert. denied, 498 U.S. 959 (1990) (citing INVST Financial Group, Inc. v. Chemical Nuclear Systems, 815 F.2d 391, 401-02 (6th Cir.), cert. denied, 484 U.S. 927 (1987)). This court reviews a district court's decision to impose Rule 11 sanctions under an abuse of discretion standard. Mann, 900 F.2d at 957. In light of the district court's "more intimate knowledge" of these cases, the district court is accorded wide discretion in determining whether the conduct of counsel was reasonable. Id.
 
 
 60
 In this case, the district court determined that Rule 11 sanctions were proper. The court noted that Michigan Chrome filed its second action without satisfying the ripeness requirement as directed by the district court when it dismissed the first action. The court also noted that although Michigan Chrome had received a hazard determination from the FAA, reasonable inquiry would have revealed the advisory nature of the FAA's finding. The district court stated:
 
 
 61
 I think the Rule 11 sanctions are warranted in this case because I think Plaintiff's complaint and relief sought were not the result of reasonable inquiry into the factual and legal bases of the claims and the filing of the papers were not reasonable under the circumstances.
 
 
 62
 In dismissing the first case, relying upon Agins v. Tiburon, 477 U.S. 255, I stated that Plaintiff's regulatory taking claim was not ripe because he had not "exhausted all avenues to gain permits and variances and must actually pursue and be denied all economically viable use of its property by a final, non-reviewable action." The second suit was filed without, clearly without satisfying the requirement that was clearly delineated in my first opinion in this case, relying upon Agins v. City of Tiburon, 477 U.S. 255. It is true that in between an FAA determination was filed but the reasonable inquiry into the law with reference to the FAA determination would have revealed that such a determination was advisory only, not binding on the City. There has been no attempt by the Plaintiff to pursue or exhaust necessary administrative remedies before bringing the second lawsuit. He has not yet filed for a permit from the City and has not sought a variance from the Board of Zoning Appeals.
 
 
 63
 J.A. 351-52.
 
 
 64
 However, although the district court found that it would impose Rule 11 sanctions, it referred the matter to a magistrate judge for a determination of the amount of sanctions to be assessed and a determination as to whether the sanctions should be assessed against Michigan Chrome or its counsel or both. The district court's order finding that it would impose sanctions under Rule 11, but not determining the amount of sanctions nor against whom the sanctions would be assessed, is not a final appealable order. See, e.g., Gates v. Central States Teamsters Pension Fund, 788 F.2d 1341 (8th Cir.1986); Morgan v. Union Metal Mfg., 757 F.2d 792 (6th Cir.1985). Thus, this court is without jurisdiction over Michigan Chrome's challenge to the district court's order imposing sanctions, and plaintiff's appeal as to the Rule 11 sanctions is dismissed without prejudice to the parties' right to timely appeal from a final order imposing sanctions.
 
 III.
 
 65
 For the reasons stated, the district court's judgment dismissing Michigan Chrome's action alleging an unconstitutional taking of its property by the City is AFFIRMED, and Michigan Chrome's appeal as to the imposition of Rule 11 sanctions is DISMISSED, without prejudice, on the ground that the district court's order imposing sanctions is not a final appealable order.
 
 
 
 [1]
 Apparently, planes taking off or landing in an easterly direction are referred to as taking off or landing on Runway 7; whereas, planes taking off or landing in a westerly direction are referred to as taking off or landing on Runway 25
 
 
 [2]
 Michigan Chrome's first notice of appeal is timely. It was filed after the district court announced the dismissal of Michigan Chrome's second action in open court but before the entry of the order of dismissal. Under Rule 4(a)(2) of the Federal Rules of Appellate Procedure, a notice of appeal filed after the announcement of a decision or order but before the entry of such judgment or order shall be treated as if filed after such entry and on the date thereof. See Welch v. Cadre Capital, 923 F.2d 989, 922 n. 2 (2d Cir.), vac'd on other grounds, 111 S.Ct. 2882 (1991)
 
 
 [3]
 There is also another exception to the finality requirement, namely, a property owner is not required to seek a variance from the zoning authority where the property owner has no plans to develop his property, since a request for a variance ordinarily cannot be considered in a vacuum. See McShane v. City of Faribault, 292 N.W.2d 253, 256 (Minn.1980). However, because Michigan Chrome's claim is based, at least in part, on its desire to further develop its property by building its proposed expansion, this exception to the futility requirement is inapplicable here